Roy O. HOFFMAN, Regional Director of the Twentieth Region of the National Labor Relations Board, for and on Behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

JOINT COUNCIL OF TEAMSTERS NO. 38, et al., Respondents.

No. 8470.

United States District Court
N. D. California, N. D.
July 12, 1962.

Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Julius G. Serot, Asst. Gen. Counsel, Harvey Letter, Regional Atty., Region 20, Walter N. Moldawer, Atty., San Francisco, Cal., for petitioner.

Le Prohn & Le Prohn, Robert Le Prohn, San Francisco, Cal., for respondents Joint Council of Teamsters No. 38; Teamsters Union, Local No. 87; Teamsters Union, Local No. 137; Teamsters Union, Local No. 150; Teamsters Union, Local No. 381; Teamsters Union, Local No. 386; Teamsters Union, Local No. 439; Teamsters Union, Local No. 517; and Teamsters Union, Local No. 684.

St. Sure, Moore & Corbett, Edward H. Moore, Oakland, Cal., for respondents Milk & Ice Cream Employers Assn.; Arden Farms Co.; Beatrice Foods Co.; The Borden Co.; Carnation Co.; Challenge Cream & Butter Assn.; Cloverleaf Farms; Crystal Cream & Butter Co.; Foremost Dairies; Foster Farms Jersey Dairy; Hite's Dairy Farm; Ideal Dairy; Inderkum's Dairy; Knudsen Creamery Co.; McColl's Dairy Products Co.; Milk Producers Assn. of Central California; Nielsen's Creamery; Producers Dairy Delivery, Inc.; Quality Dairy; Sunshine Farms; Velvet Ice Cream Co.; Vitafreeze Corp.; Wayne's Dairy; Woodbury Dairy; and Zephyr Farms.

HALBERT, District Judge.

Petitioner, on behalf of the National Labor Relations Board (hereinafter, the Board), has applied to this Court for a temporary injunction against respondents, whereby petitioner seeks to restrain respondents from giving effect to certain portions of an agreement negotiated between respondent Milk & Ice Cream Employers' Association (hereinafter, Association) on behalf of respondent creameries, and respondent Joint Council of Teamsters No. 38 (hereinafter, Council) on behalf of respondent local unions. Jurisdiction is alleged under Title 29 U.S.C. § 160($l$) [§ 10($l$) of the National Labor Relations Act]. Petitioner contends that respondents, by giving effect to the provisions of the agreement under attack, are engaged in unfair labor practices within the meaning of Title 29 U.S.C. § 158(e) [§ 8(e) of the Act], which section proscribes the entering into and maintaining of so-called "hot-cargo" contracts.

Respondent Association is a voluntary association of employers involved and engaged in the production, processing, sale or distribution of milk and dairy products in the State of California. Respondent creameries are the members of the Association. Respondent local unions (except for Local No. 381) are members of the Council, which negotiates collective bargaining contracts with the Association on their behalf. Respondent labor organizations (both the local unions and the Council) have been recognized as the collective bargaining representatives of certain of the creameries' employees, and regular contracts have been negotiated between the labor organizations and the employers (both the creameries and the Association). One such contract was negotiated and agreed upon on or about September 22, 1961, ef-

fective until September 1, 1962, and from year to year thereafter unless terminated by 60 days' written notice prior to September 1 of any year.

Petitioner, Regional Director of the Board, has objected to certain of the language contained in said contract, as setting forth unfair labor practices within the meaning of § 8(e) of the Act. Respondents admit that they are presently giving effect to the provisions under attack. Petitioner therefore has moved for judgment on the pleadings.

The language of § 8(e) of the Act reads, in part, as follows:

"It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void:
* * *."

This section was passed by Congress in 1959 in response to the "Sand Door" Case, Local 1976, United Brotherhood of Carpenters etc., v. N.L.R.B., 357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186, to close certain alleged loopholes recognized by that case. Primary among said loopholes was the allowance of so-called "hot-cargo" clauses. It is these clauses to which § 8(e) is directed.[1]

With reference to the particular clauses here involved, petitioner has objected to agreements involving non-union firms, i. e., non-union laundries (Art. 16, § 1), non-union trucking companies (Art. 5, § 4), non-union milk distributors (Art. 5,

§§ 1, 2, and 3), and struck firms (Art. 34).

Respondents have made no argument in support of their position (In fact, their position seems to be aimed at "giving up gracefully.") with reference to Article 16. That portion of the contract provides:

"[If an Employer desires his employees to wear a uniform, the Employer shall launder said uniform.] All such uniforms shall be laundered by an establishment employing AFL–CIO help [and shall be furnished under either of the following alternatives:]"

Petitioner's objections run only to that portion of the language which is not contained within the brackets. That portion objected to clearly involves an agreement not to do business with non-union laundry establishments, and therefore violates § 8(e) of the Act. As to Article 16, therefore, petitioner's motion will be granted.

Article 5, § 4, of the agreement contains similar language to that of Article 16, but respondents have set forth two defenses to petitioner's attacks upon that section. The section reads as follows:

"Hauling from processing plant to depot, federal government installation, or another processing plant, when not performed by employees under this agreement, shall be performed only by individuals or firms operating under a collective bargaining agreement with a Local Union affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America."

Again, petitioner argues that this section is aimed at securing agreement that employers will not do business with non-union trucking firms. Respondents contend: (1) that § 8(e) can apply to this

---

1. A more complete survey of the legislative history involved in the passage of § 8(e) of the Act can be found in Employing Lithographers of Greater Miami v. N. L. R. B., 5 Cir., 301 F.2d 20, and Brown v. Local No. 17, Amalgamated Lithographers, D.C., 180 F.Supp. 294.

section only if the above language is construed as an agreement to cease doing business with present haulers (as opposed to an agreement to refrain from doing business in the future with non-union haulers), and (2) that, in any event, § 8 (e) does not apply because the above language applies only to the products of the employers themselves and not to the products of other employers. Both of these contentions, however, involve one basic principle, namely, the effect of the words "cease" and "refrain" as contained in § 8(e).

It is clear (and respondents so admit) that if the above language is broad enough to include within its ambit an agreement to *cease* doing business with trucking firms which presently are engaged in hauling respondent employers' products, the "cease doing business" clause of § 8(e) is applicable, and the language of § 4 falls within said clause. Respondents' second argument, that it is their own products that are involved, does not affect this conclusion, since the "products" portion of § 8(e) refers specifically to the "cease or refrain" clause of § 8(e), which is not involved where services are the issue.

█ The language of § 4 is to the general effect that "Hauling * * * shall be performed * * *" This refers to all hauling in the future, whether by new trucking firms or by firms presently doing business with the employers. Since it is possible that said language could affect firms presently doing business with the employers, it is, at least in part, an agreement to "cease doing business".

█ Respondents' argument that, even though said language may be construed to include "cease doing business" implications, no effect can thereby be given to it since none of its present haulers are non-union, has no merit. The statute sets forth as an unfair labor practice not only ceasing to do business pursuant to agreement, but even the very act of entering into a contract providing for such cessation, whether or not said contract is actually given effect.

█ Nor is respondents' reliance upon § 8(a) (5) well taken as support for § 4 of Article 5. Respondent Association contends that it is required by that provision to bargain collectively with labor representatives before subcontracting out any work (See: Town & Country Mfg. Co., 49 LRRM 1918, 136 N.L.R.B. 111). While it may well be (as apparently is the case) that the subject of subcontracting work is a proper subject of collective bargaining, it does not follow that the instant language is protected by § 8(a) (5). That provision requires only that the parties bargain as to whether or not there shall be any subcontracting, and does not require (or, apparently, even permit) discussion with reference to determining the parties to whom such subcontracting work may be granted, once it is determined that there may in fact be such subcontracting work.

Article 5, § 4, of the Agreement, therefore, constitutes an unfair labor practice. Petitioner's motion, as to said language, will be granted.

The third portion of the Agreement to which petitioner has made objection is contained in Article 34, dealing with the "Protection of Rights". That language is in two sections, and provides:

"Section 1.

"It shall not be a violation of this agreement and it shall not be cause for discharge or disciplinary action for any employee to refuse to handle the products of or serve any individual, firm or corporation while such individual, firm or corporation is under lockout or is under a strike recognized by a Labor Council within the jurisdiction of Joint Council of Teamsters No. 38, by Local Union No. 381 or by Joint Council of Teamsters No. 38.

"Section 2.

"The Employer shall not order any employee to serve such individuals, firms or corporations or handle their products."

Respondent Council (and local unions) point out that § 8(e) does not apply to

strikes or lockouts at the premises of the employer of the employee, since no "other" employer or "other" person is involved. A refusal to handle products under such conditions is clearly protected by § 13 (Title 29 U.S.C. § 163) of the Act. Any application of § 8(e) to the above language must, therefore, be based upon the handling of products or use of services of firms with which the employers do business.

■ Respondent Council contends that the right of individual employees, while refusing to handle the products of, or serve, any individual, firm or corporation, to refuse to enter upon the premises of a struck employer is equally protected, as a "primary activity" (N.L.R.B. v. International Rice Milling Co., 341 U.S. 665, 71 S.Ct. 961, 95 L.Ed. 1284; and Milwaukee Plywood Company v. N.L.R.B., 7 Cir., 285 F.2d 325). While this may be true, it is also true that, if an employee does so refuse to act, the employer has the right to discharge the employee (N.L.R.B. v. Rockaway News Supply Co., 345 U.S. 71, 73 S.Ct. 519, 97 L.Ed. 832). The attention of this Court must, therefore, be drawn to the question of whether a contract which divests an employer of such a right is a contract requiring the employer to cease or refrain from doing business with a struck firm.

Petitioner relies upon, and respondent Council attempts to distinguish, the clauses which were found to be unlawful in Employing Lithographers Division of Graphic Arts Employers Association, 130 N.L.R.B. 985; and Brown v. Local No. 17, Amalgamated Lithographers, D.C., 180 F.Supp. 294. Respondent Council notes that in the Graphic Arts case, the Board pointed out that if the contracting employer requested an individual employee to handle non-union goods "the union may reopen the contract in whole or in part and to terminate it in the event of failure to agree." The Council claims that nothing in Article 34 imposes a penalty upon a contracting employer who continues to do business with, or handle the products of, or serve, a firm under strike or lockout, since the contracting employer is totally free to utilize non-objecting employees, supervisors, or anyone else to insure a continuation of his business relationship. Such an argument fails to recognize the consequences to an employer if his entire work-force suddenly refused to perform their duties. The result would be, with reference particularly to an employer who dealt in great part with struck firms, the virtual equivalent of a secondary boycott. It hardly need be further enunciated that secondary boycotts are illegal. (Title 29 U.S.C. § 158(b) (4) (B)).

■ Further, no showing is made that the language of Article 34 is to be restricted so as to fall within the "ally" doctrine established by Douds v. Metropolitan Federation of Architects, etc., D.C., 75 F.Supp. 672; and N.L.R.B. v. Business Machine Mechanics, etc., 2 Cir., 228 F.2d 553. That doctrine holds that an independent employer loses his neutral position and becomes an "ally" of a struck primary employer if he performs so-called "farmed out struck work," that is, work which the struck employer would ordinarily perform but is unable to perform because of the labor dispute. The language of Article 34 is not so restricted. It is, apparently, directed toward the aim of requiring the cessation and refraining from handling products of, or doing business with, an employer who, despite a strike of his own employees, is able to continue operations. The "ally" doctrine does not reach to ordinary business relations with struck employers.

As to respondents' final objection, that Article 34 does not take away the right of the employer to employ nonobjecting employees in the handling of the products from struck employers, it need only be noted that the use of "scab labor" in a union or closed shop (It will be assumed that no union member is going to violate the dictates of his own union, and the policy indicated by the leadership of that union.) is the quickest way to a condition of open hostility between labor and management.

■ Article 34 constitutes an unfair labor practice. Petitioner's motion will be granted as to Article 34.

We come, finally, to the portions of the Agreement which respondents contend are not covered by § 8(e) because they are patently prospective in nature, and involve only the concept of "refraining" from doing business, rather than that of "ceasing" to do business. Article 5 of the Agreement deals with "Distribution of Products". The first three sections of that Article provide:

"Section 1.

"The Employer agrees to refrain from doing business with any person engaged in the distribution of fluid milk or ice cream products who has not executed this agreement.

"Section 2.

"[In order to preserve the work and job opportunities of Route Drivers and Relief Route Drivers covered by this agreement, the Employer agrees that he will not transfer a single route to a single truck, independent contractor distributor or a single truck owner operator employee without the prior consent of the Union.] The employer further agrees that no route or portion thereof will be transferred without the prior consent of the Union unless after such transfer, the work or services transferred will be performed by an employee of an employer who is, or prior to such transfer agrees to become, a signatory to this agreement.

"Section 3.

"New or additional distribution of fluid milk or ice cream products shall not be performed by an independent contractor or owner operator employee without the prior consent of the Union, unless said distribution is performed:

"(a) by an employee of an employer who is signatory to this agreement; or

"(b) by an independent contractor distributor who purchases at least two hundred (200) units for distribution per delivery day per route from a source which is not signatory to this agreement; or

"(c) by an independent contractor distributor or owner operator employee who purchases products for distribution from another employer who is signatory to this agreement."

In each of these cases, the activities sought to be covered are prospective in nature. Section 1 uses the language "agrees to refrain". Section 2 prohibits the transfer of existing routes except to a signatory without union permission (The section actually prohibits cessation of existing routes, rather than requiring it.). Section 3 deals solely with "new or additional distribution".

Each of these sections requires a determination of the question left open in the discussion of the language of Article 5, § 4, namely, the interpretation to be placed on the difference in wording in § 8(e) between the "ceases or refrains or agrees to cease or refrain from handling * * * the products of any other employer" clause and the "to cease doing business with any other person" clause. The difference urged by respondents is the failure of Congress to include the word "refrain" in the "doing business" clause.

■■ Preliminarily, it should be noted that judicial power cannot properly be exercised to supply an essential word or phrase which has been omitted and is not necessarily included in the meaning of the context (62 Cases, More or Less, Each Containing Six Jars of Jam v. United States, 340 U.S. 593, 71 S.Ct. 515, 95 L.Ed. 566; Fisher Flouring Mills Co. v. United States, 9 Cir., 270 F.2d 27; Harris v. C.I.R., 2 Cir., 178 F.2d 861; United States v. One 1955 Ford Sedan, etc., D.C., 164 F.Supp. 729; and In re Shear, D.C., 139 F.Supp. 217). In connection with § 1 of Article 5, the precise wording of the "handling products" clause was omitted in the "doing business" clause, namely, the word "refrain".

Without the necessity of here defining the difference between "cease" and "refrain", it is enough to note that there is a difference, by the inclusion of both phrases in one clause and of only one in the second clause. It appears clear that the omission of the word "refrain" was a considered omission, and this Court will not subvert whatever the reasons for such omission may have been. As to § 1 of Article 5, petitioner's motion will be denied.

Sections 2 and 3 of Article 5 are not so clear in their language. They both clearly refer to future conduct (i. e., the transfer of existing routes, and new and additional distribution). Respondents contend that the word "refrain" refers specifically to future conduct, as distinguished from the word "cease", which is said to refer only to present conduct. Petitioner equates the two words. The Court is not impressed with either position.

■ First, as to petitioner's contention, the very use of two separate words is an indication, as noted above, of some sort of different meaning to be ascribed to each of them. Particularly is this true when, as is the case in § 8(e), one of the allegedly identical words is omitted in one place and not in another. As indicated above, there is some difference between the words "cease" and "refrain".

■ The fact that there is some difference between "cease" and "refrain", however, does not necessarily mean that said difference is that one indicated by respondents. Unquestionably the word "cease" implies that the objective referred to has been in existence, and is to be stopped. It does not follow, however, that the word "refrain" must be limited to future events exclusively. The concept may be of "refraining" from doing, in the future, that which one is presently doing, but said concept is little different from that of "ceasing" to do, in the future, that which one is presently doing. As so used, the words "ceased" and "refrain" may be synonymous, as contended by petitioner. However, there are also contexts in which they are not synonymous, as contended by respondents (e. g., "refraining" from doing something in the future which is *not* presently being done).

■ With reference to the present provisions, however, there is no language cited which deals with any agreement to "cease" doing business with any existing business associate. Both of the aforementioned provisions (§§ 2 and 3 of Article 5) deal with relationships to be regulated *in futuro*. Whether such relationships would be covered by reference to the word "refrain", as used in the "handling products" clause, is not now to be determined. What is here determined is that §§ 2 and 3 of Article 5 do not involve the cessation of any presently existing business relationships. For that reason, petitioner's motion as to §§ 2 and 3 of Article 5 will be denied.

In summary, then, the language of the Agreement, with reference to the distribution of milk products, is couched in terms of future performance. Such language, under the "doing business" clause of § 8(e), is not sufficient to require a finding of an unfair labor practice. With reference to the language of the Agreement involving hauling contracts, laundering, and "protection of rights", however, said language either is susceptible of an interpretation affecting existing business relationships, or it falls within the "cease or refrain" prohibitions of the "handling products" clause, and therefore within the proscription of § 8(e).

It is, therefore, ordered that, as to Article 5, § 4; Article 16, § 1; and Article 34 of the Agreement entered into between the Association and the Council, petitioner's motion for judgment on the pleadings in his action seeking a temporary injunction be, and the same is, hereby granted;

And it is further ordered that, as to Sections 1, 2 and 3 of Article 5 of said Agreement, petitioner's motion for judgment on the pleadings be, and the same, is, hereby denied.