334 F.2d 539
 118 U.S.App.D.C. 149
 TRUCK DRIVERS UNION LOCAL NO. 413, INTERNATIONAL BROTHERHOOD
OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN & HELPERS
OF AMERICA, et al., Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
TRUCK DRIVERS & HELPERS LOCAL UNION NO. 728, INTERNATIONAL
BROTHERHOOD OFTEAMSTERS, et al., Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, Watson-Wilson
TransportationSystem, Inc., et al., Intervenors.
 Nos. 17662, 17663.
 United States Court of Appeals District of Columbia Circuit.
 Argued Oct. 30, 1963.
Decided April 9, 1964, Certiorari Denied Nov. 16, 1964, See
85 S.Ct. 264.
 
 Mr. David Previant, Milwaukee, Wis., with whom Messrs. Herbert S. Thatcher, Washington, D.C., and L. N. D. Wells, Jr., Dallas, Tex., were on the brief, for petitioners in No. 17,662.
 Mr. L. N. D. Wells, Jr., Dallas, Tex., with whom Messrs. David Previant, Milwaukee, Wis., and Herbert S. Thatcher, Washington, D.C., were on the brief, for petitioners in No. 17,663.
 Mr. Gary Green, Atty., N.L.R.B., with whom Messrs. Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Melvin J. Welles, Atty., N.L.R.B., were on the brief, for respondent.
 Mr. Robert T. Thompson, Atlanta, Ga., with whom Mr. Alexander E. Wilson, Jr., Atlanta, Ga., was on the brief, for intervenors in No. 17,663.
 Mr. Mozart G. Ratner, Washington, D.C., for Glass Bottle Blowers Ass'n of United States and Canada, AFL-CIO, amicus curiae.
 Mr. Fred W. Elarbee, Jr., Atlanta, Ga., for Brown Transport Corp., amicus curiae in No. 17,663.
 Before BAZELON, Chief Judge, and BASTIAN and WRIGHT, Circuit judges.
 J. SKELLY WRIGHT, Circuit Judge:
 
 
 1
 The National Labor Relations Board has found certain Picket Line, Struck Goods, Subcontracting, and Hazardous Work clauses in the collective bargaining agreements of petitioner unions void under Section 8(e)[1] of the Labor Act. In their Petition to Review and Set Aside, the unions contend that these provisions are outside the prohibitions of 8(e) because their aim is benefit to the employees of the bargaining unit, not control of, or interference with, the contracting employer's third-party relationships. The Board cross-petitions for enforcement.
 
 
 2
 A preliminary issue is whether it is the object, the effect, or the express or implied terms of the challenged clauses which are relevant to the 8(e) charge. The unions suggest an object test, by parity of reasoning with 8(b)(4)(B)'s secondary boycott provisions.[2] The Trial Examiner, in one of these companion cases, No. 17,663, considered the effect of the clauses to be relevant to their validity under 8(e), and took extensive evidence of their effect. The Board, however, at the instance of its General Counsel, held that the implementation of a contract was not relevant to its validity under 8(e), that extrinsic evidence of object alone was not determinative, and that the contract must be tested by its terms, express or implied. See Mary Feifer, d/b/a American Feed Company, et al., 133 N.L.R.B. 214 (1961). We agree.
 
 The Picket Line Clause
 
 3
 A key provision in the union contracts protects the right of individual employees to refuse to cross picket lines by immunizing them against employer discipline. This picket line clause is broadly worded to achieve maximum application permitted by the law. The Board held that under 8(e) of the Act the clause may validly apply only to certain types of picket lines; the union apparently would apply it to all.
 
 The clause provides:
 
 4
 'It shalll not be a violation of this Agreement and it shall not be cause for discharge or disciplinary action in the event an employee refuses to enter upon any property involved in a labor dispute or refuses to go through or work behind any picket line, including the picket line of Unions party to this Agreement and including picket lines at the Employer's place or places of business.'
 
 
 5
 The Board concedes that the contract clause may permissibly operate to protect refusals to cross a picket line where the line is in connection with a primary dispute at the contracting employer's own premises. This seems clearly correct. Employees who refuse to cross such a line are entitled to the same protection as strikers under Sections 7[3] and 13[4] of the Act. See N.L.R.B. v. John S. Swift Company, 7 Cir., 277 F.2d 641, 646 (1960). The refusal to cross being a protected activity, the union and the employer may provide by contract that such refusal shall not be grounds for discharge. See National Labor Relations Board v. Rockaway News Co., 345 U.S. 71, 80, 73 S.Ct. 519, 97 L.Ed. 832 (1953).
 
 
 6
 A different result must be reached where the picket line at the contracting employer's own premises is itself in promotion of a secondary strike or boycott. Refusal to cross that line would itself be secondary activity. To the extent that the clause would protect such refusal to cross, it would then be authorizing a secondary strike, and would pro tanto be void under 8(e) of the Act. There is no merit to the unions' suggestion that this clause is outside the reach of 8(e) because it protects individual refusals, not union-induced refusals. We read our own cases as having rejected this argument. See Los Angeles Mailers Union No. 9, Inter. Typo. U. v. N.L.R.B.,114 U.S.App.D.C. 72, 311 F.2d 121 (1962).
 
 
 7
 The Board also held that the clause may validly protect refusals to cross a picket line at the premises of another employer if that picket line meets the conditions expressed in the proviso to 8(b)(4)[5] of the Act. Clearly this is the law. See National Labor Relations Board v. Rockaway News Co., supra; Meier & Pohlmann Furniture Company v. Gibbons, 8 Cir., 233 F.2d 296, 301, cert. denied, 352 U.S. 879, 77 S.Ct. 101, 1 L.Ed.2d 80 (1956).
 
 
 8
 The remaining question concerns refusals to cross a picket line at another employer's premises where that line does not meet the conditions of the 8(b)(4) proviso. The unions maintain that refusal to cross any lawful primary picket line is primary activity under the Act and that protection thereof in the bargaining agreement falls outside the ambit of 8(e). The Board held that refusal to cross a non-proviso picket line constitutes secondary activity, and that contractual protection of such activity violates 8(e).
 
 
 9
 A useful approach to this question is through the legislative history of the 1959 amendments which incorporated 8(e) into the Act. The House Labor Committee report stated: 'It is settled law that the National Labor Relations Act does not require a truckdriver to cross a primary picket line * * *. * * * The employer could agree that he would not require the driver to enter the strikebound plant.' House Committee Report, 1 LEGISLATIVE HISTORY OF THE LABOR-MANAGEMENT REPORTING AND DISCLOSURE ACT OF 1959 at 779 (1959).[6] It is also clear 'that the right to refuse to cross a primary picket line would not be affected by' the hot cargo ban in the bill passed by the Senate. Kennedy-Thompson analysis, 2 id. 1708(2-3).[7] 'However, in order to set at rest false apprehensions on this score, the (House) committee appended the disclaimer proviso' which appears in the bill as reported by the House Committee.[8] This disclaimer explicitly protected the right of refusal to cross primary picket lines, and the right to sign contracts immunizing such refusals from employer discipline.[9] The entire House Committee bill, however, including this disclaimer, was replaced by the Landrum-Griffin substitute on the floor of the House. But the Landrum-Griffin substitute was unacceptable to the Senate conferees because: 'The House (Landrum-Griffin) bill apparently destroys the right to picket a plant and to honor a picket line even in a strike for higher wages. This change in the present law is entirely unacceptable.' 2 id. 1708(3). It seems clear that, at least on this point, the Senate viewpoint was adopted in conference, modifying the Landrum-Griffin version. The Senate conferees secured the insertion of the following broad and all-encompassing declaration of congressional policy in the bill: 'Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing.' Section 8(b)(4)(B).
 
 
 10
 The then Senator Kennedy explained the effect of this new provision to the Senate:
 
 
 11
 '* * * The secondary boycott provisions of the House bill would have curtailed legitimate union activities. Accordingly, the Senate conferees insisted that the report secure the following rights:
 
 
 12
 '(a) The right to engage in primary strikes and primary picketing even though the employees of other employers refused to cross the picket line.
 
 
 13
 'The fact of the matter is that there is some question under the Landrum-Griffin bill whether employees of another employer could have properly refused not to cross a picket line in a primary strike. That has been clarified in the conference report.'
 
 
 14
 2 LEGISLATIVE HISTORY OF THE LABOR-MANAGEMENT REPORTING AND DISCLOSURE ACT OF 1959 at 1432-1433.
 
 
 15
 Senator Kennedy further stated in a report to the Senate on the Conference: 'We have protected the right of employees of a secondary employer, in the case of a primary strike, to refuse to cross a primary strike picket line.' 2 id. 1389(1). This stated effect of the Senate-House Conference action seems to have been generally accepted. A speech of Senator Douglas inserted in the Congressional Record shortly afterward explained:
 
 
 16
 'Under the compromise, we also protected the right of employees of a secondary employer to refuse to cross a picket line in the case of a primary strike. The Landrum-Griffin bill, as written, appeared to take this right away.'
 
 
 17
 2 id. 1834(1).
 
 
 18
 In addition, Professor Cox, now the Solicitor General, who was one of the principal architects of the legislation, has confirmed that the intendment of the Act is that 'section 8(e) would not prohibit agreements sanctioning refusal to cross a lawful primary picket line.'[10]
 
 
 19
 It would seem that even without this legislative history, a similar conclusion would be demanded by the case law. It has been clear since Rockaway News that whenever refusal to cross a picket line is a protected activity, unions and employers may sign contracts providing that the refusal shall not be ground for discharge. In Rockaway news the activity in question was within the 8(b)(4) proviso, but the Court did not limit the principle there announced to proviso activity. The Board itself recently held in the Redwing[11] and Everist[12] cases that refusal to cross a primary picket line was indeed a protected activity, without even considering whether the picket lines met the terms of the 8(b)(4) proviso. And, in Redwing, we affirmed the Board's holding 'that the employees had in fact engaged in protected concerted activity when they refused to cross the picket line,' also without regard to whether the proviso was satisfied. Sub nom. Teamsters, Chauffeurs & Helpers Local U. No. 79 v. N.L.R.B., 117 U.S.App.D.C. 84, 325 F.2d 1011, 1012 (1963). In fact, we are aware of no case which limits protection of refusal to cross a primary picket line to 8(b)(4) proviso situations.
 
 
 20
 Similar conclusions are suggested by National Labor Relations Board v. International Rice Milling Co., supra Note 6, and Electrical Workers Local 761 v. National Labor Relations Board, 366 U.S. 667, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961). Since 'appealing to neutral employees whose tasks aid the employer's everyday operations' is a 'traditional primary activity,' id. at 681 of 366 U.S., at 1293 of 81 S.Ct. 6 L.Ed.2d 592, primary picketing retains its primary characteristic even though it induces deliverymen to refuse to cross the line. Thus it seems clear that refusal to cross a lawful primary picket line, absent demonstrated secondary intent, is itself primary, and as such falls outside the Act's proscriptions against secondary activity. Teamsters, Chauffeurs & Helpers Local U. No. 79 v. N.L.R.B., supra. Compare Seafarers Intfernational Union, etc. v. N.L.R.B., 105 U.S.App.D.C. 211, 216, 265 F.2d 585, 590 (1959). Since 8(e) is limited to secondary activity, a provision in the bargaining agreement immunizing the exercise of this protected right against employer discipline does not violate it. See National Labor Relations Board v. Rockaway News Co., supra.
 
 The Struck Goods Clause
 
 21
 A second section of the collective bargaining agreement which is in dispute concerns Struck Goods. It reads:
 
 
 22
 'Recognizing that many individual employees covered by this contract may have personal convictions against aiding the adversary of other workers, and recognizing the propriety of individual determination by an individual workman as to whether he shall perform work, labor or service which he deems contrary to his best interest, the parties recognize and agree that:
 
 
 23
 '((a)) It shall not be a violation of this Agreement and it shall not be a cause for discharge or disciplinary action if any employee refuses to perform any service which, but for the existence of a controversy between a labor union and any other person (whether party to this Agreement or not), would be performed by the employees of such person.
 
 
 24
 '((b)) Likewise, it shall not be a violation of the Agreement and it shall not be a cause for discharge or disciplinary action if any employee refuses to handle any goods or equipment transported, interchanged, handled or used by any carrier or other person, whether a party to this Agreement or not, at any of whose terminals or places of business there is a controversy between such carrier, or person, or its employees on the one hand and a labor union on the other hand; and such rights may be exercised where such goods or equipment are being transported, handled or used by the originating, interchanging or succeeding carriers or persons, whether parties to this agreement or not.
 
 
 25
 '((c)) The Employer agrees that it will not cease or refrain from handling, using, transporting, or otherwise dealing in any of the products of any other employer or cease doing business with any other person, or fail in any obligation imposed by the Motor Carriers' Act or other applicable law, as a result of individual employees exercising their rights under this Agreement or under law, but the Employer shall, notwithstanding any other provision in this Agreement, when necessary, handle, use, transport or otherwise deal in such products and continue doing such business by use of other employees (including management and representatives), other carriers, or by any other method it deems appropriate or proper.'
 
 
 26
 In considering clause (a) of this section, the Board acknowledged that it may lawfully apply where the relationship between the contracting employer and the employer with a labor dispute is so close as to render them 'allies.' The present state of the struck work-- ally doctrine is outlined in Douds v. Metropolitan Federation of Architects, etc., S.D.N.Y., 75 F.Supp. 672 (1948), and National Lab. Rel. Bd. v. Business Machine & Office Appliance Mechanics, 2 Cir., 228 F.2d 553 (1955), cert. denied, 351 U.S. 962, 76 S.Ct. 1025, 100 L.Ed. 1483 (1956). These cases are specifically cited in the conference report on the 1959 amendments, as representing the existing law which Congress did not intend to supersede. 1 LEGISLATIVE HISTORY OF THE LABOR-MANAGEMENT REPORTING AND DISCLOSURE ACT OF 1959 at 942. Under these decisions, an employer is characterized as an 'ally' of the struck firm 'when he knowingly does work which would otherwise be done by the striking employees of the primary employer and where this work is paid for by the primary employer pursuant to an arrangement devised and originated by him to enable him to meet his contractual obligations. The result must be the same whether or not the primary employer makes any direct arrangement with the employers providing the services.' National Lab. Rel. Bd. v. Business Machine & Office Appliance Mechanics, supra at 559 of 228 F.2d. As Judge Learned Hand phrased the test: 'One does not make oneself a party to the dispute with a primary employer by taking over the business that the strike has prevented him from doing. On the other hand if a secondary employer, knowing of the strike, not only accepts the customer of the primary employer but takes his pay, not from the customer but from the primary employer * * * (then he has) made common cause with the primary employer.' Concurring opinion, id. at 562. This court has adopted the ally doctrine in New York Mailers' Union No. 6, Inter. Typo. U. v. N.L.R.B., 114 U.S.App.D.C. 370, 371, 316 F.2d 371, 372 (1963).
 
 
 27
 The Trial Examiner found clause (a) to be limited in scope to the 'ally' doctrine, and therefore valid. But the Board read the clause as impermissibly broad, in that under it employees of the contracting employer might refuse to perform services which met the first test of Business Machine, supra ('otherwise done by the striking employees'), even if the second test of that rule were not met ('pursuant to an arrangement'). But cf. N.L.R.B. v. Amalgamated Lithographers of America (Ind.), 9 Cir., 309 F.2d 31, 37-38 (1962), cert. denied, 372 u.S. 943, 83 S.Ct. 936, 9 L.Ed.2d 968 (1963).
 
 
 28
 We agree with the Board that to the extent clause (a) protects refusals to work beyond the scope of the ally doctrine, it authorizes a secondary boycott, and so is pro tanto void under 8(e) of the Labor Act. We refrain from defining the exact limits of the ally doctrine, however, and do not decide whether the Business Machine tests are adequate for all variations in factual situations. Such spelling out is best left for the elucidating process or gradual inclusion and exclusion provided by specific cases.
 
 
 29
 Clause (b) of the Struck Goods section, set out above, seems to be a typical hot cargo clause, prohibited by 8(e) of the Act. The unions contend, however, that this clause-- like others in the contract-- is immune from 8(e)'s prohibition because it protects the freedom of decision of the individual laborer, rather than creates a power of decision in the union itself. Since few workers will exercise their rights under these clauses, the unions argue, there will be no substantial interference with the business of the employer, particularly in view of the provisions of clause (c). The short answer to this contention is that it has already been rejected by this court. See Los Angeles Mailers Union No. 9, Inter. Typo. U. v. N.L.R.B., supra. See also New York Mailers Union No. 6, Inter. Typo. U. v. N.L.R.B., supra; Employing Lithographers of Greater Miami v. N.L.R.B., 5 Cir., 301 F.2d 20 (1962); N.L.R.B. v. Amalgamated Lithographers of America (Ind.), supra; and Brown v. Local No. 17, Amalgamated Lithographers, N.D.Cal., 180 F.Supp. 294 (1960). Moreover, the legislative history of the 1959 amendments equates these 'employee-rights' clauses with other hot cargo clauses. It is clear that 8(e) was aimed, among other targets, at provisions in contracts under which an employer agrees: he cannot 'require his employees to handle any (goods) which * * * came from an employer engaged in a labor dispute,' 1 LEGISLATIVE HISTORY OF THE LABOR-MANAGEMENT REPORTING AND DISCLOSURE ACT OF 1959 at 779 (House Report); he cannot 'require his employees to handle goods or provide other services for the benefit of an employer who is involved in a labor dispute,' 2 id. at 1007 (Senator McClellan); 'that his employees do not have to handle goods which the union labels as 'hot," 2 id. at 1197 (Senator Curtis); 'his employees do not have to handle or work on goods produced or handled by another employer who happens to be in disfavor with the union,' 2 id. at 1079 (Senator Goldwater); he will 'not * * * carry the goods and not * * * require his employees to handle them,' 2 id. at 1708 (Kennedy-Thompson analysis).
 
 
 30
 We must conclude, therefore, as did the Board, that this clause (b) is void under 8(e) of the Act and that clause (c) does not save it.
 
 The Subcontracting Clause
 
 31
 The third major challenged provision of the collective bargaining agreements here concerns Subcontracting:
 
 
 32
 'The Employer agrees to refrain from using the services of any person who does not observe the wages, hours and conditions of employment established by labor unions having jurisdiction over the type of services performed.'[13]
 
 
 33
 The Board found this clause was secondary, and therefore void under 8(e) of the Act. It reasoned:
 
 
 34
 'Like the typical hot cargo clause itself, a subcontractor clause is secondary where it limits, not the fact of subcontracting-- either prohibiting it outright or conditioning it upon, e.g., current full employment in the unit-- but the persons with whom the signatory employer may subcontract. * * *'
 
 
 35
 This Board position groups together, as secondary, contract clauses which impose boycotts on subcontractors not signatory to union agreements, and those which merely require subcontractors to meet the equivalent of union standards in order to protect the work standards of the employees of the contracting employer. But the distinction between these two types of clauses is vital. Union-signatory subcontracting clauses are secondary, and therefore within the scope of 8(e), while unionstandards subcontracting clauses are primary as to the contracting employer. We so held in Building & Construction Trades Council v. N.L.R.B., 117 U.S.App.D.C. 239, 328 F.2d 540 (1964). We drew this same distinction in Orange Belt District Council of Painters No. 48 v. N.L.R.B., 117 U.S.App.D.C. 233, 328 F.2d 534 (1964); in District No. 9, International Ass'n of Machinists v. N.L.R.B.,114 U.S.App.D.C. 287, 315 F.2d 33 (1962); and in Retail Clerks Union Local 770, etc. v. N.L.R.B., 111 U.S.App.D.C. 246, 296 F.2d 368 (1961).
 
 
 36
 This clause would be a unionsignatory clause if it required subcontractors to have collective bargaining agreements with petitioner unions or their affiliates, or with unions generally. We interpret it, however, as merely requiring that subcontractors observe the equivalent of union wages, hours, and the like.[14] Since we find that this clause only requires union standards, and not union recognition, we follow the line of cases in this court cited above to rule it primary, and thus outside 8(e)'s prohibitions.[15]
 
 Other Issues
 
 37
 Some further points remain. The Board also asks enforcement of that part of its order voiding a Hazardous Work clause, which it reads as imposing penalty wage and benefit rates, designed to compel employer adherence to the Picket Line and Struck Goods sections, to take effect if these sections should be held illegal. The unions contend that this clause merely provides reasonable protections for an employee who is compelled to face the dangers of a picket line. This section was never adopted by the unions and the employers as part of their permanent contract; it was contained in a preliminary agreement which was in force temporarily, but was deleted before final signature. Thus the unions and employers have repudiated the section. The Board has not shown any likelihood that this or a similar agreement would, if not prohibited, be included in any future bargaining contract. Moreover, the Trial Examiner ruled that this section was not in the case, and, as the unions contend, it was never adequately litigated before the Board. Thus we do not know the extent of danger involved in crossing a picket line in this industry. Compare Teamsters, Chauffeurs & Helpers Local U. No. 79 v. N.L.R.B., supra. Though we recognize that the mere cessation of an unfair labor practice does not destroy the jurisdiction of the Board and the courts to issue appropriate orders, under the circumstances of this case we are moved to refrain from deciding upon the validity of this clause. We therefore set aside this portion of the Board's decree, without prejudice to further proceedings on this issue if the Board feels them necessary.
 
 
 38
 The unions have also raised the suggestion that 8(e) is arbitrary and unconstitutional because of the special treatment of the garment and construction industries. This argument has already been rejected by several courts. Employing Lithographers of Greater Miami v. N.L.R.B., supra, at 24-27 of 301 F.2d; N.L.R.B. v. Amalgamated Lithographers of America (Ind.), supra, at 45 of 309 F.2d; Brown v. Local No. 17, Amalgamated Lithographers, supra, at 305-306 of 180 F.Supp. We have been shown no adequate reason why we should not follow their lead. Courts today no longer sit in review of the economic wisdom of the distinctions drawn by the legislature, and the failure to grant exemption from 8(e) to all industries which claim they merit an exemption does not void the Act. In this connection, we note that the unions in the trucking industry were the prime target of congressional concern. We hold 8(e) to be constitutional.
 
 
 39
 There remains the question of the appropriate relief. As to some sections of the contract, we have found the clauses to have a valid scope of operation under the law, but to be prohibited by law from operating outside that scope. Though the Board's decree is ambiguous, a section of its opinion suggests that in such a situation of partially-valid clauses, the entire clauses as written should be struck down.[16] If this is the Board's view, we do not agree.
 
 
 40
 Ordinarily, the rubric of not rewriting the contract for the parties does bear some relation to labor contracts. Every collective bargaining agreement is the resultant of opposing forces, representing their relative strengths and positions. To limit clauses won by one side, while leaving in effect the remainder of the contract, would upset the balance struck at the bargaining table. Indeed, these considerations would suggest that, not just the challenged clauses, but the entire labor contract should be voided as a whole, if one part must be struck down.
 
 
 41
 But these considerations do not govern in situations such as here. This is not a case where the unions, by sacrificing other dearly desired privileges, have won from employers acceptance of clauses in the contract, clearly intended to confer union rights, but later found to violate the Act. Rather the clauses here seem purposefully to be drawn in broad terms to achieve maximum application permitted by the new amendments to the Act. Both unions and employers must have anticipated that these amendments would not permit the clauses to be given the most expansive reading the bare words allowed. A more narrow reading, or even a partial excision, must have been within the contemplation of the experienced counsel who purposefully cast the clauses in such general terms. To borrow the language of the Supreme Court in National Labor Relations Board v. Rockaway News Co., supra, at 78-79 of 345 U.S., at 524 of 73 S.Ct., 97 L.Ed. 832, 'The parties, who could not foresee how some of the provisions of the statute would be interpreted, proposed to go as far toward union security as they are allowed to go, and this is their right; and they proposed to go no farther, and that is their whole duty.' Where the parties 'have misunderstood the legal limits of their bargain,' if possible 'the excess may be severed and separately condemned * * *.' Ibid.[17]
 
 
 42
 We therefore conclude that a decree should be drafted condemning the challenged contract clauses only to the extent found unlawful by this court.
 
 
 43
 Enforced in part and set aside in part.
 
 
 
 [1]
 73 Stat. 543, 29 U.S.C. 158(e)
 
 
 [2]
 73 Stat. 542-543, 29 U.S.C. 158(b)(4)(B)
 
 
 [3]
 61 Stat. 140, 29 U.S.C. 157
 
 
 [4]
 61 Stat. 151, 29 U.S.C. 163
 
 
 [5]
 The 8(b)(4) proviso reads:
 'Provided, That nothing contained in this subsection shall be construed to make unlawful a refusal by any person to enter upon the premises of any employer (other than his own employer), if the employees of such employer are engaged in a strike ratified or approved by a representative of such employees whom such employer is required to recognize under this subchapter: * * *'
 
 
 [73]
 Stat. 543, 29 U.S.C. 158(b)(4)
 
 
 [6]
 Similar opinions as to the law are expressed in the Supplementary Views of five members of the Committee, 1 id. 838. Both the majority and concurring reports cite National Labor Relations Board v. International Rice Milling Co., 341 U.S. 665, 71 S.Ct. 961, 95 L.Ed. 1284 (1951). Congressman Elliott's analysis refers to 'the right to refuse to cross the picket line where an employer is engaged in a primary labor dispute' as 'already contained in the Taft-Hartley Act.' 2 LEGISLATIVE HISTORY OF THE LABOR-MANAGEMENT REPORTING AND DISCLOSURE ACT OF 1959 at 1588(3). And Senator Morse stated on the floor of the Senate: 'I want to point out the Rockaway decision of the Supreme Court which makes clear that where there is a contract with an employer, a worker is protected in his refusal to go through a picket line, if the contract specifies that he has a right of refusal.' 2 id. 1312. See National Labor Relations Board v. Rockaway News Co., supra
 
 
 [7]
 As Senator Morse's analysis had it, 'The Senate bill was not intended to affect the rights of anybody in connection with a primary strike or picket line.' 2 id. 1326(1). The Supplementary Views of the five House Committee members stated: 'The language of the 'hot cargo' ban in (the Senate bill)-- which your committee adopted (for the House Committee bill)-- did not impinge in any way on existing law concerning the crossing, or not crossing, of primary picket lines by employees.' 1 id. 838; see also id. at 849
 
 
 [8]
 Supplemental Views, 1 id. 838; see also Senator Morse's remarks, 2 id. 1326(1)
 
 
 [9]
 See id. 755-756
 
 
 [10]
 '* * * The fear has been expressed that the prohibition (8(e)) would invalidate agreements sanctioning conduct like the refusal of the truck drivers to cross the picket line at our hypothetical Modern Furniture Co. plant. However, the rationale of the new law points to a narrower interpretation. Section 8(b)(4)(A) refers to all inducements of employees of a secondary employer which are directed toward forcing him 'to cease using, selling, handling, transporting or otherwise dealing in the products of any other producer, processor or manufacturer, or to cease doing business with any other person.' But under the Rice Milling case and the new confirmatory proviso, * * * it does not constitute an unlawful secondary boycott to induce employees to refuse to cross a primary picket line where the refusal causes the secondary employer to cease doing business with the primary employer at the site of the labor dispute. The same words are repeated in outlawing 'hot cargo' agreements. The prohibition was drafted in aid of the restriction upon secondary boycotts. The same distinction based upon the situs should therefore be observed, with the result that section 8(e) would not prohibit agreements sanctioning refusal to cross a lawful primary picket line.' Cox, The Landrum-Griffin Amendments to the National Labor Relations Act, 44 MINN.L.REV. 257, 272-273 (1959)
 Other distinguished commentators have also read Senator Kennedy's conference report, and the 'primary strike' amendment itself as 'specifically' intending that 'employees of another employer may lawfully refuse to cross a picket line in a primary strike.' Goldberg & Meiklejohn, Title VII: Taft-Hartley Amendments, with Emphasis on the Legislative History, 54 NW.U.L.REV. 747, 768 (1960).
 
 
 [11]
 Redwing Carriers, Inc., et al., 137 N.L.R.B. 1545 (1962)
 
 
 [12]
 L. G. Everist, Inc., et al., 142 N.L.R.B. No. 20 (1963)
 
 
 [13]
 Since this clause is entitled 'Subcontracting,' we assume-- in the absence of any indication to the contrary-- that its scope is limited to the contracting out of work which otherwise would be performed by members of the bargaining unit
 
 
 [14]
 The Board's processes are adequate, we take it, to insure that substantial compliance with union standards or the equivalent will suffice under such a clause, and that the union will not be allowed to use it as a device to limit subcontracting to union firms
 
 
 [15]
 In view of this disposition, it is unnecessary to consider the unions' argument based on the possible difference in meanings between 'cease' and 'refrain' as used in 8(e). Compare Hoffman v. Teamsters Joint Council No. 38, N.D.Cal., 230 F.Supp. 684 (1962)
 
 
 [16]
 Compare Employing Lithographers of Greater Miami v. N.L.R.B., supra, with N.L.R.B. v. Amalgamated Lithographers of America (Ind.), supra
 
 
 [17]
 See Local Lodge No. 1417, Int. Ass'n of Machinists v. N.L.R.B., 111 U.S.App.D.C. 235, 236-237, 296 F.2d 357, 358-359 (1961); cf. N.L.R.B. v. Amalgamated Lithographers of America (Ind.), supra; see also Manning v. Ellicott, 9 App.D.C. 71, 81 (1896); RESTATEMENT, CONTRACTS 607, Comment a