**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WARE-HOUSEMEN AND HELPERS OF AMERICA, LOCAL 294, Respondent.**

No. 225, Docket 29096.

United States Court of Appeals
Second Circuit.

Argued Dec. 8, 1964.

Decided March 3, 1965.

Stephen B. Goldberg, Atty., N. L. R. B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Robert G. Sewell, Atty., N. L. R. B., of counsel), for petitioner.

Harry Pozefsky, Gloversville, N. Y., for respondent.

Before WATERMAN, MOORE and KAUFMAN, Circuit Judges.

MOORE, Circuit Judge.

The National Labor Relations Board (the Board or NLRB) petitions for enforcement of its order, as amended, issued against International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local 294 (Local 294). In substance, the Board found that Local 294 had violated sections 8(b) (4) (ii) (A) and (B) and 8 (e) of the National Labor Relations Act (the Act). 145 NLRB 484 (1963). The facts and the law support the Board's decision and order and enforcement is granted.

M. V. Kellogg Company (Kellogg) was the prime contractor for the construction of a $60 million dollar addition to a cement plant of the Alpha Portland Cement Company at Cementon, Greene County, New York. Kellogg gave the contract for excavation and foundation work on the project to A. S. Wikstrom, Inc. (Wikstrom). Wikstrom and Local 294 of the Teamsters' Union were parties

to a labor agreement (referred to as the AGC agreement) whereby Local 294 was recognized as the "sole" bargaining representative of all "employees covered by the Brotherhood of Teamsters jurisdiction," i. e., within Greene County and its environs, including drivers of cement "Agitator or Mixer Trucks." The "wages, hours and working conditions" provided in the AGC agreement were specifically made applicable to the "entire work" covered by the contract including any subcontract let by the employer on such work. In Article VI of the AGC agreement, entitled "Subcontracting," "site work" is defined as "all work done on the site proper and all hauling from an area outside the project area to the project area, which outside area is operated and maintained by the prime Contractor for use in conjunction with the project."

In December, 1962, Wikstrom ordered ready-mix concrete for the Cementon project from Island Dock Lumber, Inc. (Island Dock), a supplier of building materials located at Kingston, New York, about 14 miles from the Cementon project. Island Dock's employees, including its cement truck delivery drivers, were represented by Lumber Yard Employees Local Union No. 1150 of the United Brotherhood of Carpenters and Joiners of America, AFL–CIO (Local 1150).

Late in December, 1962, representatives of Local 294 informed Wikstrom that Local 294 construed the AGC agreement as requiring that all on-site driving (in other words, all deliveries to the Cementon project including those made by ready-mix concrete trucks) had to be done by members of Local 294 regardless of the union affiliation of the employees of any particular supplier. Local 294 gave Wikstrom a list of "approved suppliers" that used Local 294 drivers and

stated that the Teamsters would "take the proper steps to see that there were [Local 294] union drivers on the trucks." Wikstrom subsequently informed the business agent of Local 1150 that it was about to cancel the order with Island Dock due to pressure from Local 294. In retaliation on December 26th, Local 1150 called a strike of its carpenters employed on the Cementon project.

On December 27th a meeting of all parties, except Island Dock, was held in an effort to resolve this impasse. An agreement was reached whereby Local 1150 carpenters were to resume work and Wikstrom would continue to deal with Island Dock. In return, a member of Local 294 would be put aboard each Island Dock truck as it reached the Cementon project[1] and Wikstrom agreed to pay the wages of these extra Local 294 drivers. Pursuant to this agreement, Wikstrom renewed its order with Island Dock and the Local 1150 carpenters returned to work on December 28th.

Island Dock was scheduled to make its first delivery on the morning of January 7, 1964. That morning, Island Dock instructed its drivers not to permit Teamsters on its trucks.[2] Members of Local 294 stopped the first Island Dock truck in front of the Cementon project by parking a pickup truck across the road. A member of Local 294 then asked to board the Island Dock truck and when refused, informed the driver that he "couldn't go in the [Cementon] project." A second Island Dock truck was flagged down by members of Local 294 and the driver was told that he would not be allowed in the project until the "labor trouble was settled." Island Dock's sales manager then instructed the Island Dock drivers, by two-way radio, to return to the supplier's plant and dump their loads.

---

1. It is not clear whether the agreement of December 27th required members of Local 294 to drive the Island Dock trucks once they reached the Cementon project or whether a Local 294 member was merely required to be on board as a passenger.

2. In its testimony before the Board, Island Dock stated that the terms of its insurance policies on its vehicles would not permit the Teamsters to board its trucks.

Wikstrom subsequently decided that it had had enough of labor disputes and cancelled its order with Island Dock. Ready-mix concrete was then purchased from suppliers employing members of Local 294.

Local 1150 filed unfair labor practice charges against Local 294. The NLRB found that Local 294 had violated sections 8(b) (4) (A) and (B) of the Act by forcing or requiring Wikstrom to agree to an interpretation of the AGC agreement prohibited by section 8(e) of the Act, and by forcing or requiring Wikstrom to cease doing business with Island Dock.

Local 294 does not seriously contest the findings of fact made by the Board but contends that the interpretation of the AGC agreement which it sought to impose on Wikstrom did not violate section 8(e) and, therefore, that its efforts to obtain such an interpretation did not violate section 8(b) (4) (ii) (A). The union argues further that its pressure against Wikstrom and Island Dock was insulated by the "construction industry" proviso to section 8(e) and thus from the prohibitions of section 8(b) (4) (ii) (A), regardless of whether these tactics fell within the scope of the general prohibitions of section 8(e).

However, the Board's findings are supported by substantial evidence and its interpretation of the applicable law is correct. The threats and other pressures exerted by Local 294 against Wikstrom, in order to make it clear to the employer that the Teamsters themselves would walk off the job if the Island Dock order were not cancelled and, generally, in order to disrupt Wikstrom's dealings with Island Dock, amounted to the coercive means forbidden by section 8(b) (4) (ii) (A). NLRB v. Milk Wagon Drivers, 335 F.2d 326 (7th Cir. 1964); NLRB v. Plumbers' Union, 299 F.2d 497, 500 (2d. Cir. 1962). "Hot cargo" agreements in any form are prohibited

by section 8(e). Truck Drivers Union Local No. 413, Intern. Broth. of Teamsters v. NLRB, 118 U.S.App.D.C. 149, 334 F.2d 539, cert. denied, 379 U.S. 916, 85 S.Ct. 264, 13 L.Ed.2d 186 (1964). The statements of representatives of Local 294 clearly indicate that the pressures exerted by Local 294, when it learned that Wikstrom had placed an order with Island Dock, were intended to force Wikstrom to agree to boycott the products of Island Dock as an employer of members of a rival union. The interpretation of the AGC agreement urged by Local 294 was thus intended to accomplish the traditional function of a hot cargo agreement. Comment, 62 Mich. L.Rev. 1176, 1187 (1964); Cox, The Landrum-Griffin Amendments to the National Labor Relations Act, 44 Minn.L. Rev. 257, 273 (1959). This interpretation was, therefore, within the purview of the provisions of section 8(e), NLRB v. Milk Wagon Drivers, supra; Building & Constr. Trades Council of San Bernardino and Riverside County v. NLRB, 117 U.S.App.D.C. 239, 328 F.2d 540, and of the objects of union activity prohibited by section 8(b) (4) (ii) (A).[3]

Nor is the union insulated from the effect of section 8(b) (4) (ii) (A) by the "construction industry" proviso to section 8(e). Since the proviso is limited to "work done at the site of the construction," it does not sanction a "boycott against suppliers who do not work on the job site." Burstein, The "Hot Cargo" Clause and LMRDA, Symposium on the Labor Management Reporting and Disclosure Act of 1959, at 888, 891 (Slovenko ed. 1961); H.R.Rep. No. 1147 on S.1555, 86th Cong., 1st Sess., Sept. 3, 1959, at 39, in 1 NLRB, Legislative History of the Labor Management Reporting and Disclosure Act of 1959, 943 (1959). Island Dock did not "work on the job site" but merely made deliveries to Wikstrom at the Cementon site. This is significant because the

3. In effect, the Milk Wagon Drivers case treated an effort to force an interpretation of an agreement on an employer as the equivalent, for the purposes of section 8(b) (4) (A), of an effort to force the employer to enter into a new agreement.

**22**

legislative history indicates that the proviso was not intended to protect agreements relating to supplies transported to and delivered on the construction site. 1 Leg.Hist. 943 (1959). Here the act of mixing previously loaded ingredients in the ready-mix trucks once they reached the project, relied upon by Local 294 as on-site work, was, as the Board found, merely the final act of the delivery process.

■■ There was also substantial evidence to support the Board's conclusion that Local 294 violated section 8(b) (4) (ii) (B). This Court has held that a threat to strike against a secondary employer if he did not cease doing business with a primary employer amounts to a use of the coercive means prohibited by section 8(b) (4) (ii) (B). NLRB v. Plumbers' Union, supra. In the present case, the statements of representatives of Local 294 to Wikstrom can fairly be construed as threats to pull Local 294 members off the job or to take steps equally detrimental to Wikstrom unless the Island Dock order were cancelled or all deliveries were made by members of Local 294. This conclusion is given further support by the subsequent conduct of members of Local 294 in blocking access to the Cementon project on January 7, 1963.

■■ Local 294 attempts to justify its actions by the argument that its efforts constituted job protection measures and were directed at Wikstrom, which the union labels as the primary employer in this labor dispute. But there was nothing primary about the efforts of Local 294. Local 294 had no real labor dispute with Wikstrom; but it did have a vital and continuous grievance against those, such as Island Dock, which employed the members of other unions in jobs claimed by the Teamsters. Local 294 made a continued, concerted and ultimately suc-

cessful effort to impose an agreement on Wikstrom whereby, in effect, Wikstrom would boycott Island Dock until the supplier recognized Local 294 as its bargaining agent.[4] In the course of these efforts, Local 294 forced Wikstrom to "cease doing business" with the actual primary employer, Island Dock, within the meaning of the objects prohibited by section 8(b) (4) (B). Even a lawful agreement would not permit the use of such coercive measures against a secondary employer to force him to cease doing business with the primary employer. See, e. g., Orange Belt District Council of Painters No. 48, AFL–CIO v. NLRB, 117 U.S.App.D.C. 233, 328 F.2d 534, 537 (1964).

Enforcement granted.

---

4. In fact, it would have been impossible for Island Dock to recognize Local 294 without violating the provisions of the Act, since Local 1150 had itself only re-

cently won recognition as the bargaining agent of Island Dock's employees and the Board's one-year certification bar was still applicable.