**BURNS BROS. PLUMBERS, INC.,** Plaintiff-Appellee and Cross-Appellant,

v.

**GROVES VENTURES COMPANY and S. J. Groves & Sons Company,** Defendants-Appellants and Cross-Appellees.

Nos. 18372, 18373.

United States Court of Appeals Sixth Circuit.

June 18, 1969.

John C. Egbert, Jr., Cincinnati, Ohio, for Burns Bros. Plumbers, Inc., William K. Hoskins, James R. Adams, Cincinnati, Ohio, on brief; Frost & Jacobs, Cincinnati, Ohio, of counsel.

Philip J. Schneider, Cincinnati, Ohio, for Groves Ventures Co., and others; Waite, Schindel, Bayless & Schneider,

Stanley M. Chesley, Cincinnati, Ohio, on brief.

Before O'SULLIVAN, EDWARDS and COMBS, Circuit Judges.

O'SULLIVAN, Circuit Judge.

This case presents an appeal and a cross-appeal from a judgment entered on November 3, 1967, in the United States District Court for the Southern District of Ohio, Western Division. The judgment awarded to Burns Bros. Plumbers, Inc., plaintiff-appellee and cross-appellant, the sum of $28,832.55 in Burns' suit against Groves Ventures Company and its subsidiary, S. J. Groves & Sons Company (treated together here as Groves), defendants-appellants.

Burns' suit against Groves asserted claims totalling $130,000 arising out of work connected with a subcontract that Burns had made with Groves in June, 1959. Groves, in May, 1959, had entered into a contract with the United States Corps of Engineers for construction of the Meldahl Locks in the Ohio River between Clermont County, Ohio, and Bracken County, Kentucky. The price for the entire work was $25,000,000 and Burns' subcontract, covering certain work on the piping and mechanical systems for the locks, originally called for payment of about $387,000.

This suit, first brought in the Southern District of New York, was transferred to the Southern District of Ohio pursuant to 28 U.S.C. § 1404(a). By agreement of the parties, the Court appointed a Special Master, D. G. Aronberg, to hear the evidence and make proposed Findings of Fact. Aronberg, who was not a lawyer but an engineer with fifty years of experience in the construction industry, filed an initial report on November 4, 1966, after taking evidence. Upon objection filed by both parties, the District Court resubmitted the matter to the Master who considered interrogatories and answers submitted by both parties and made a supplemental report on June 20, 1967. The District Court on November 3, 1967, pursuant to Rule 53(e) (2), Fed.R.Civ.P., determined that the Master's Findings were not clearly erroneous, accepted them, and ordered that Burns recover from Groves the sum of $28,832.55, plus interest.

Groves appeals from three parts of that decision: (1) an award of $4,541.-41 in payment for the cost of Burns' sectional testing of pipe which was demanded by Groves but which had not been stipulated in the subcontract; (2) $6,150 awarded to Burns as damages alleged to have been suffered because of 41 days delay in the completion of the project caused by the flooding of the Ohio River, and (3) $18,141.14 awarded to Burns as damages alleged to have accurred because of Groves' failure to supply Burns adequate electricity. Burns cross-appeals from part three of the decision, claiming that the award was inadequate.

We affirm the judgment entered upon the above items (1) and (3), but reverse as to item (2).

1. Sectional testing.

Burns' work of installing the piping and mechanical systems for the locks was initially carried on inside the cofferdam.[1] During the course of the work, Burns, at the request of Groves, did what is referred to as separate or sectional testing of the various component installations making up the hydraulic system. Burns' position is that its only obligation under the subcontract was to carry out such testing at the conclusion of its work, and that the interim sectional testing added to its cost in the amount of $4,541.41. The prime contract between Groves and the Corps of Engineers provided in Sections 16–14 and 16–16 in part as follows:

"16–14 *Hydraulic Oil.*

Upon completion of the installation and cleaning of oil lines, hydraulic oil

---

1. A cofferdam is a watertight enclosure from which water is pumped to expose the riverbed and permit construction of the locks.

shall be added to the system to fill all hydraulic lines and equipment including all hydraulic operating machinery

\* \* \*."

"16–16 *Operating tests*.

Upon completion and prior to acceptance of the installation, the contractor shall subject the hydraulic system to such operating tests as may be required by this contracting officer to demonstrate satisfactory functional and operating efficiency. \* \* \*."

■ Groves seemed to concede that the above provisions did not explicitly require any testing prior to the completion of the hydraulic system. While there is sharp dispute on the point, Burns claimed that Groves agreed that the work of interim sectional testing, made necessary by the progress of the work, should be considered as an extra for which Burns should be paid. Testing of the hydraulic system was done by introduction of oil. Burns showed that if it could do this work in one final operation, it would bring the oil to the site of the work by an oil tanker and the pumping of oil from such tanker into the system would be a much more economical operation—both from handling and the price of the oil—than the piecemeal testing which required transporting and handling the oil in barrels. The Special Master found that Groves had agreed to pay for the involved work as an extra, and awarded Burns $4,541.41 —the amount which he found the cost of the sectional testing exceeded the cost of testing in the manner provided for in the subcontract. There was evidence from which such a finding of fact could be made, the finding was adopted by the District Judge and we are satisfied that it was not clearly erroneous. It is binding on us. Rule 52(a), Fed.R.Civ.P.

Appellant Groves argues that Section 28 of the subcontract is controlling. This section provides:

"It is agreed that the terms and conditions of this agreement are fully covered in the foregoing and that any verbal statements made by either party or agents claiming to represent either party are to be considered of no effect whatever."

In disposing of this contention, the District Judge said:

"We do not consider that Section 28 amounts to a 'contract in writing not to make any other contracts except in writing.' \* \* \* In any event, the finding of fact of the Master was that a new contract was in fact made covering something not covered by the original contract."

■ Groves also argues that the parol evidence rule was offended by permitting the establishment of a term not in the original subcontract, and employing parol evidence to do so. Notwithstanding the many efforts to expand the parol evidence rule so as to foreclose contracting parties from making new oral agreements relating to the general subject matter of a written contract, it is now well established that the rule does not foreclose what was agreed upon by Burns and Groves as found by the Master.

"This [the parol evidence rule] does not preclude parol evidence from being introduced to prove the making of a contemporaneous contract which does not cover the same ground [as the written contract] \* \* \*. Nor does the rule preclude the admission of evidence of the subsequent modification of the integrated agreement by parol or written contract." 4 Williston on Contracts, § 631, pp. 948–951.

■ The alleged oral agreement in the case at bar was entered into subsequent to the signing of the subcontract and the Master found it to cover terms not covered in either the prime contract or the Burns-Groves subcontract. In Grandcourt Land Co. v. Raymond, 4

Ohio Law Abst. 629 (1920), the Ohio Court of Appeals[2] held that:

"Where an oral contract is made subsequent to a written contract and especially after work under the written contract has been commenced, parol evidence of the latter contract is competent."

*See also*, Dusi v. Albanese, 74 Ohio App. 136, 57 N.E.2d 802 (1943).

■ Groves also urges that the Ohio Statute of Frauds, Ohio Revised Code, § 1335.05, bars Burns' recovery. This statute requires that,

"No action * * * upon a contract or sale of lands, tenements, * * * or interest in or concerning them, or upon an agreement that is not to be performed within one year from the making thereof * * *"

shall be maintainable unless such agreement is in writing. This statute is inapplicable as the alleged oral agreement involved the performance of certain testing operations. It did not concern a contract or interest in land and was to be performed in less than one year.

### 2. Delays caused by flooding.

Neither the prime contract nor the Burns-Groves subcontract was performed within the original time schedule. The subcontract provided:

"6. The Subcontractor agrees to commence work contracted for within five calendar days after being notified in writing by the Contractor to do so and to complete said work to the satisfaction and acceptance of the Owner within 700 calendar days from notification to commence, or by August 1, 1961. No extension of time of performance of this contract shall be recognized by the Contractor without the written consent of the Contractor."

Completion of the prime contract was delayed some 467 days beyond the original completion date of August 1, 1961. Part of this delay was the result of the flooding of the cofferdam as a consequence of an unforeseen rise in the Ohio River, and part was the result of additional work performed by Groves as a consequence of changes in specifications by the Corps of Engineers. For additional work performed and for the consequences to Groves for the flooding of the cofferdam, Groves received nearly two million dollars over the original $25,000,000 contract price. The principal contract provided in Clause 1–09:

"*Flooding of cofferdam.* In the event that the cofferdam is in an unwatered condition and a rise in the river overtops and floods the cofferdam, an allowance of $25,000 for flooding and cleanup of the cofferdam, plus a sum of $1,000.00 per day for each calendar day, or fraction thereof, beginning at midnight following the time the cofferdam is flooded and ending at the time the river recedes below the elevation of the bottom of the sluiceway, will be paid the contractor, subject to the following conditions."

The evidence showed that Groves was allowed no extra compensation for the mere delay following flooding of the cofferdam, but only for work actually done during such time. There was evidence from which it could be found that the delays due to flooding damaged Burns by both indirect and direct costs accruing to it during such delays.

The Master found that Burns suffered such damage, and granted relief as follows:

"There is no reason to write any new language into this Clause, because it clearly states that $25,000.00 per flood is for '*flooding and clean-up*' and the $1,000.00 is not stated to be for any work, but merely 'per day'. I claim that it's for Overhead and Indirect Cost that could not be cut off Groves' payroll during the delay period.

"At the time of Groves first flood, May 19, 1960, Burns was not yet on

---

2. Burns questions the applicability of Ohio law, but suggests no alternative. We consider that Ohio law governs, as Ohio was the place of contracting and the place of a substantial part of the performance of the contract.

the job, so we will deduct $13,000.00 (13 calendar days at $1,000.00) from the total of $54,000.00 (54 calendar days at $1,000.00) which Groves received, which leaves us $41,000.00. As to Burns' Overhead and Indirect Cost, I estimate it at about $150.00 per day. I Find at this point that Burns is entitled to 41 days at $150.00 per day, a total of $6,150.00."

He determined that no other allowance against Groves could be made and concluded:

"In view of all the foregoing, I cannot Find for the Plaintiff in any amount for the Second part of this Count [claim outside of the flooding matter], but do Find for him, for the first part of the Count in the sum of $6,150.00."

The District Court affirmed the Master's Finding.

■ We share the Master's apparent view that Burns must have suffered substantial damages from these delays and understand his desire that Burns should have some share of what the Corps of Engineers paid to Groves. The Master sought to do equity, but we consider that there was no contractual basis for his Finding. Section 10 of the Burns-Groves subcontract precluded Burns from claiming "extra compensation on account of delays, interference or hindrance caused by the Contractor or other Subcontractors in the performance of their respective items of work." The subcontract is silent with respect to damages on account of delays caused by any other source, such as flooding of the cofferdam. We consider that the absence of a clause allowing claims for such damages forecloses Burns from recovery.

Moreover, there is no provision in the prime contract which indicates that Groves was to use its payments under Clause 1–09 for the purpose of reimbursing its subcontractors. There were eighteen subcontractors in addition to Burns involved on the project and presumably some of them were damaged by the flooding. If several were to claim and be awarded damages, Groves' $1,000 per day payment would soon be depleted, and the beneficiaries of Clause 1–09 of the prime contract would be the subcontractors rather than Groves.

Flooding of the Ohio River is predictable and contemplated. The specifications for the job warned all bidders of the possibility of floods. Burns had the opportunity to raise its bid to account for anticipated flooding or to request a clause pertaining to flood damage in its subcontract. The absence of such a clause forecloses relief. The award is vacated.

3. Damages for inadequate electric supply.

The prime contract between Groves and the Corps of Engineers provided in paragraph 10 of the Special Conditions that:

"All electric current required by the Contractor * * * shall be furnished at his own expense."

and Section 21 of the Burns-Groves Subcontract provided:

"The Contractor agrees to provide working areas, not including buildings or utilities, except that *the Subcontractor may connect to the Contractor's utilities * * * without charge for such services.*" (Emphasis supplied.)

Burns chose to connect to Groves' source of electricity which came from the Cincinnati Gas & Electric Co. To have made its own connection and paid for the electricity used would have prohibitively added to the cost of Burns' completion of the contract. The Master commented on this by saying:

"[F]or Burns to have furnished his own temporary electrical service, according to the testimony as to what it cost Groves, it could have cost Burns half or more of his entire contract price, and this was taken into consideration by both parties when preparing their bids."

The Master, contrary to the contention of Groves, held that the above quoted Section 21 of the subcontract,

"Establishes Groves' obligation to Burns just as clearly as if these two clauses were transformed to the following:

'All Subcontractors without cost to them shall connect to the Contractor's Temporary Electrical Service and the Contractor guarantees that this Installation and Maintenance will provide proper service to all Subcontractors for their operations requiring electrical current.' " [3]

■ We are satisfied that in this case there is evidentiary support for the Master's conclusion. If his findings in this regard may in part be read as conclusions of law, we observe that the District Judge agreed with the Master, as do we.

To support its claim for damages for breach of Groves' contract to furnish an adequate supply of electricity, Burns' employees testified that throughout their work the supply fluctuated and periodically failed to the extent that the efficiency of their welding equipment was seriously impaired. There was testimony that because of the inadequate supply of electricity, a team of Burns' welders—whose principal work on the project consisted of welding pieces of pipe together—would weld an average of only four to six welds per day instead of the normal ten to sixteen.

Using the hourly rate of pay for Burns' welders and computing Burns' loss resulting from their reduced productivity, Burns' supervisor calculated the loss at a total figure of $40,313.63. The Master found that Burns had suffered damages but, because Burns' calculations of the loss were in part determined from "memory and observation," he applied an error factor of 10%, thus reducing the loss to $36,282.27.

Groves contended that Burns' failure to efficiently employ the available electric supply was due to the type of welding equipment used by it—the buzz-box or transformer-rectifier type—instead of the so-called motor-generator type. From the evidence it was permissible for the Master to conclude that some part of Burns' loss was due to the type of its welding equipment used on this project. The Master concluded:

"In view of all the foregoing, I am satisfied that Burns had fluctuating voltage and voltage drop difficulties due to inadequate temporary wiring, and that this could have been made adequate by Groves electrical engineer Bosch, but Groves never reported Burns' trouble to Bosch.

"The next subject to deal with is the so-called 'buzz-box' or more correctly, transformer-rectifier type of welding machines used by Burns. * * *

"Mr. Bosch stated in his Testimony that 90% of all mechanical Contractors used Motor Generator Sets and that the type Burns used was only 60% efficient. Other witnesses also testified that Motor Generator Sets should have been used. Therefore, the weight of evidence is strongly against the Plaintiff.

"To conclude, I find both the Plaintiff and the Defendant equally at fault, the Defendant furnishing inadequate Electrical Service and the Plaintiff using the wrong Welding Machines. This item should be split 50–50. But first, I want to cut 10% off Roberts' estimate of $40,313.63, as I can't go along with his estimating by 'memory and observation'. This leaves $36,-282.27 and, one-half of this, $18,141.14 I find for Burns, the Plaintiff."

■ The Special Master's appears to have again used his expertness to come up with what he considered a just approximation of a proper award. We, however, are satisfied that there was

---

3. The Master in making these strong and forthright observations was in part employing his own long experience as an engineer and builder. It may point up the dangers inherent in using experts in the subject matter of litigation as the final arbiters on disputed questions of fact and law. Such persons may at times rely on their own knowledge and ability rather than evidence, subject to testing by cross-examination.

evidence which raised the Masters' calculations above mere speculation, and as findings of fact they were found by the District Judge not to be clearly erroneous. We do not find reversible error in the District Judge's conclusion. He followed the familiar rule that, where one's right to damages is established, his right will not be denied even though a calculation of damages cannot be accomplished with mathematical exactness. Story Parchment Co. v. Paterson Paper Co., 282 U.S. 555, 562–563, 51 S.Ct. 248, 75 L.Ed. 544, 548 (1931); Bigelow v. RKO Radio Pictures, 327 U.S. 251, 263, 66 S.Ct. 574, 90 L.Ed. 652, 660 (1946); Flame Coal Co. v. United Mine Workers, 303 F.2d 39, 44 (6th Cir.1962); Merritt, Chapman & Scott Corp. v. Guy F. Atkinson Co., 295 F.2d 14, 17 (9th Cir.1961).

Our sustaining of the District Judge and the Master upon the merits of this issue disposes of Burns' cross-appeal on the Master's finding that Burns' inferior equipment created 50% of the welding problem. We need not consider Groves' contention that Burns' cross-appeal was procedurally defective.

We affirm the District Court as to issues 1 and 3 and reverse as to the award of damages for delay. The case is remanded to the District Court for entry of judgment consistent with this opinion. Each party will pay its own costs on appeal.