William C. LANDSTROM, d/b/a Landstrom Gravel Co., Plaintiff-Appellee,

v.

CHAUFFEURS, TEAMSTERS, WAREHOUSEMEN & HELPERS LOCAL UNION NO. 65 OF the INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN & HELPERS OF AMERICA, Defendant-Appellant.

No. 334, Docket 72-1906.

United States Court of Appeals, Second Circuit.

Argued Jan. 15, 1973.

Decided March 30, 1973.

Peter P. Paravati, Utica, N. Y., for defendant-appellant.

James L. Burke, Elmira, N. Y., for plaintiff-appellee.

Before FRIENDLY, Chief Judge, and OAKES and TIMBERS, Circuit Judges.

OAKES, Circuit Judge:

This appeal is by a local union held liable for $60,000 compensatory damages under § 303 of the Labor Management Relations Act of 1947, 29 U.S.C. § 187, for unfair labor practices as defined in § 8(b)(4)(ii)(B) of the Act, 29 U.S.C. § 158(b)(4)(ii)(B).[1] The appellee, a non-union gravel and ready-mix concrete contractor in Ithaca, New York, alleged that he lost jobs as a result of appellant's threats to shut down major area contractors if they subcontracted gravel or concrete work to appellee. The questions raised by the appeal relate to (1) sufficiency of the evidence of a violation of § 8(b)(4)(ii)(B); (2) sufficiency of the evidence concerning the charge pertaining to, and excessiveness of, damages; and (3) the admission of evidence on matters not set forth in appellee's answers to interrogatories.

1. Section 8 provides in pertinent part:

(b) It shall be an unfair labor practice for a labor organization or its agents—

(4) . . . (ii) to threaten, coerce, or restrain any person . . . where . . . an object thereof is—

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing[.]

We resolve the questions of liability in appellee's favor but reverse and remand for a new trial on the issue of damages.

Appellee's business is a small one, on the outskirts of Ithaca, where he has a gravel pit, a transit mix concrete plant, three concrete mixers (one standby), about five dump trucks, and eight regular employees. After trying unsuccessfully in 1967 to organize the plant, the appellant union picketed it for two weeks in the spring of 1969. Apparently the picketing was stopped after both the union and appellee had filed charges with the NLRB. These charges were later dropped by mutual agreement before May 23, 1969. After that date, for the most part, the course of conduct on which this suit was brought ensued.

Taking the evidence in the light most favorable to the party prevailing before the jury, it appears that appellee had started to supply sand, gravel, or in one case ready-mix concrete to a number of contractors in the period 1969–1971 when he was told by the contractors or their representatives to stop making delivery. There was testimony from those coerced as follows:

(1) John Card, assistant superintendent for Dyer Fitts Construction Company in charge of the Cornell Student Housing Project, testified that he stopped appellee from making deliveries to his site because the appellant's business agent "told me I better not use Landstrom's trucks delivering on that job . . . that he might shut the job down, our part of the work down."

(2) James Cartwright, executive secretary of the Cortland-Ithaca Building Exchange, a contractors' group, testified that he had several meetings with Mr. Michaels,[2] the business agent of the appellant, who told him that the union "would quite possibly have to picket" the job sites of members of the Exchange who dealt with Landstrom. Acting on this information, Cartwright advised the Exchange's membership "they should anticipate some type of work stoppage" if they utilized Landstrom material or service. One of the contractors to whom Cartwright said he told this was Mr. McGuire of the firm of Stewart and Bennett.

(3) Mr. McGuire, whose employer was the prime contractor on the Spencer-Van Etten School project, corroborated Cartwright, saying that he recalled being informed by Cartwright that "there was a possibility that the job could have trouble, pickets and so forth," if Landstrom was used. As a result of Cartwright's statement, although Landstrom was low bidder, he did not get the 6–7,000 yard concrete contract for the school.

(4) Donald H. Brown, general superintendent of Streeter Associates, another contractor, testified that he had a conversation with Michaels before the Inlet Park job, in the course of which Michaels told him, "You must realize we don't have an agreement with Landstrom and if you use him you would be violating your contract with us." As a result of that conversation, according to Brown, Streeter did not order gravel from Landstrom that would have otherwise been ordered. Brown also implied that because of the "groundwork [that] had been laid" in discussion with Michaels about the Inlet Park job, Landstrom did not get the contract to supply gravel on the Unex Press job. Brown also testified, however, that another supplier—Paully Mancini & Son—did haul gravel that was bought at the Landstrom pit to the Unex Press job.

(5) Elwood Marshall, plant foreman of a Landstrom sand supplier, Rumsey-Ithaca Company, testified that Michaels "came to us and told us not to load any of the Landstrom trucks," and that "if we loaded trucks, he was going to shut the place down." As a result of Michaels' intervention with Rumsey-Itha-

2. Appellee originally also sued Michaels and Lawrence Small, Secretary-Treasurer of the appellant. These suits were dismissed by consent prior to trial.

ca, Landstrom had to find another, more expensive, supplier of sand.

(6) Rhaeto Pfister, president of Lynch Excavating Trucking Corporation, who had the excavating contract at the Ithaca College dormitories, testified that he stopped deliveries by Landstrom after "[t]he Teamsters informed us that if Bill Landstrom continued to deliver gravel that . . . I am not sure if he said picketing, or he would pull his men off, there would be a strike. Something to the effect that we would have a shutdown." He also testified as to a similar threat by Michaels in connection with the excavating contract at Cornell Student Complex at Cornell University and as to his "other jobs," including jobs at Tompkins Hospital and BOCES School. Pfister's testimony was subsequently corroborated by the testimony of his then excavation superintendent, William J. Mobbs.

(7) John H. Boniface, Assistant Vice President of A. Frederick & Sons, contractors on the First National Bank job at Ithaca, testified that he had employed Landstrom on that job but then had a call from Michaels. The substance of Michaels' message was that "if [Boniface] continued, . . . using the non-union equipment, [Michaels] would put pickets on that job." Boniface, however, used Landstrom anyway, without further consequences.

(8) Peter Giacobbi of Giacobbi Excavating and Grading Contractors Incorporated said he conferred with Michaels who told him Landstrom was "not union at all" and that thus he could not use Landstrom on the Northeast School Job, one involving some 8,373 cubic yards of gravel.

(9) William Schlobohna, plumbing superintendent of J & B Plumbing & Heating, testified that he had had to stop using Landstrom for hauling a small amount of gravel for a water main ditch in downtown Ithaca when Michaels

told him that Landstrom's gravel was "nonunion" and that Michaels "would shut down the job if I continued to use it."

■■ The principal line of defense to all of this evidence was that there was a "subcontractor's clause" [3] in the contracts between the union and the general contractors which required that subcontractors pay their employees the same as the general contractor paid its employees. By using Landstrom, the union argued, a general contractor was violating that clause. Thus Michaels, when asked whether he had ever threatened to shut down any of the contractors for using Landstrom, testified that he had merely "told them I was going to go to the grievance procedure," by which he explained that he meant "I contacted my legal attorney, I find out what I can do legally, outside of giving him the seventy-two hour notice or three day notice and withdrawing my men." In essence, however, the jury disbelieved Michaels' testimony that he did not tell Card, Pfister, Mobbs, Boniface, Marshall, or Schlobohna that he was going to picket their jobs or shut them down. While there is no indication that Landstrom was a subcontractor, as opposed to being a supplier, even if he were, the clause could only be enforced through the courts, NLRB v. Local 445, 473 F.2d 249 at 252 (2d Cir., 1973), since the clause was clearly "secondary." *See* Orange Belt Painters District Council No. 48 v. NLRB, 117 U.S.App.D.C. 233, 328 F.2d 534, 537–538 (1964). Here there was a jury issue under § 8(b)(4)(ii)(B) in that the jury rationally could have found that appellant threatened or coerced a number of general contractors and others with the object of forcing them "to cease using, selling, . . . or otherwise dealing in the products of any other producer, . . . or to cease doing business with any other person . . . ." There was evidence from

---

3. On the validity of such clauses, *see* Truck Drivers Local 413 v. NLRB, 118 U.S. App.D.C. 149, 334 F.2d 539, cert. denied,

379 U.S. 916, 85 S.Ct. 264, 13 L.Ed.2d 186 (1964).

which the jury could have found the appellee's conduct was "unmistakably and flagrantly secondary" and caused a severe disruption of Landstrom's business relationships with contractors not involved in the primary labor dispute. NLRB v. Local 825, Operating Engineers, 400 U.S. 297, 304–305, 91 S.Ct. 402, 27 L.Ed.2d 398 (1971). *See* Note, Secondary Boycotts: The New Scope and Application of the "Cease Doing Business" Requirement of Section 8(b)(4) (B), 71 Colum.L.Rev. 1077, 1087 (1971); 12 B.C.Ind. & Comm.L.Rev. 1255 (1971). Thus, appellant's contention that the evidence was insufficient to support the jury's finding of a § 8(b)(4)(ii)(B) violation must be rejected.

██ Appellant makes a somewhat confused subsidiary argument in reference to the Cornell Student Housing and Rumsey-Ithaca job which also applies to the statement made by Michaels to Cartwright of the Building Exchange and repeated by Cartwright to McGuire so as to deprive appellee of the Spencer-Van Etten School contract. As we understand it, appellant relies on the proviso to § 8(b)(4)(ii)(B) [4] and Sailor's Union of the Pacific (Moore Dry Dock),

92 NLRB 547 (1950), approved in Local 761, Electrical Workers v. NLRB, 366 U.S. 667, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961), and argues that since the alleged threats relating to those three projects occurred during the pendency of a primary dispute between Landstrom and the union, the union could properly picket (and implicitly threaten to picket) Landstrom wherever he was working until the primary dispute was ended in the spring of 1969. The jury could well have found, however, that the threats that occurred in the spring of 1969 went beyond a threat of picketing in conformity with *Moore Dry Dock* standards, for Michaels' words were ominous and threatening and included an explicit or implied threat to shut the neutral contractor down if he continued to deal with Landstrom. The *Moore Dry Dock* rules are only evidentiary aids to the finder of fact and can be overcome by other evidence of illegal secondary purpose. NLRB v. Northern California District Council of Hod Carriers, 389 F. 2d 721, 725 (9th Cir. 1968). But more important, the issue was not raised below, the court's charge did not deal with it,[5] and no objection was taken to any

---

4. Section 8(b)(4)(ii)(B) makes an explicit exception with respect to primary disputes. *See* note 1 *supra. See generally* United Steelworkers v. NLRB, 376 U.S. 492, 84 S.Ct. 899, 11 L.Ed.2d 863 (1964); Typographical Union No. 37 v. NLRB, 131 U.S.App.D.C. 1, 401 F.2d 952 (1968); NLRB v. Northern California District Council of Hod Carriers, 389 F. 2d 721 (9th Cir. 1968).

5. The pertinent portion of the charge as to appellant's defenses read as follows:

The defendant Union, on the other hand, denies that its officers many [sic] any threats to anyone as testified to by the various witnesses produced by the plaintiff. The defendant contends that on various occasions its president advised contractors with whom the Union had agreements that it would resort to the lawful procedure set forth in those agreements to enforce the Union's rights under them. The Union concedes that in the course of a dispute with the plaintiff in the spring of 1969 it posted pickets at its place of business. They

deny threatening to picket or strike on any other or in connection with anyone else.

You will recall that there is evidence that various charges and counter-charges were filed with the National Labor Relations Board as a result of which the pickets were withdrawn and the matter was resolved in some manner.

The defendant further denies that its actions taken in connection with the plaintiff had any object or purpose or intent to require or force any of the contractors or the Rumsey-Ithaca Corporation to cease doing business with the plaintiff.

Finally, the defendant denies that the plaintiff suffered any injury to his business and property as a proximate result of any unfair or unlawful labor practice. The defendant further maintains that it was only seeking to enforce its rights under three contracts which were introduced into evidence . . . .

Obviously, this did not suffice to place the *Moore Dry Dock* issue before the jury.

failure to charge on this question. We would add that as we read the record, the most appellant might have been entitled to in any event was a charge in respect only to the three jobs mentioned above. Concededly such a charge might have affected the damages substantially, but having permitted the case to be submitted otherwise, appellant cannot now be heard to complain.

■ Appellant's final argument on liability is that as to the A. Frederick job, by leaving the gravel in different piles Landstrom was doing on-site work. Hence the argument is this was work performed by a subcontractor, not a supplier, and subject to the subcontractor clause of the contractor's labor contracts and the construction industry proviso to § 8(e), 29 U.S.C. § 158(e).[6] But the work Landstrom performed on this particular job is no different from the delivery of concrete by mixing and pouring it at the job site, which we held not to be subcontracting in NLRB v. Teamsters Local 294, 342 F.2d 18, 21–22 (2d Cir. 1965).

Relative to damages, the only evidence consisted of Landstrom's uncontroverted testimony that his profit (the excess of selling price over cost) on the sale of gravel picked up at his pit was 25 cents per yard, on the sale of gravel delivered by his trucks to a work site approximately 75 cents per yard, and with regard to concrete at the Spencer-Van Etten school job (the only one involving the sale of concrete) $8.95 per yard. Briefly stated, there was evidence from which the jury could find that, multiplying the numbers of yards of gravel lost on the various jobs by the "profits" above stated, together with a "lost profit" for 5400 yards of concrete at $8.95 per yard or $48,330, the total damage on this basis was $74,625.25.[7]

■ Appellant argues, however, that as a matter of law the evidence on damages was insufficient because appellee had the burden of proof of damages, Jodice v. Calabrese, 80 LRRM 2681 (S. D.N.Y., June 6, 1970), was free to and did use his employees and materials on other jobs, and made no showing of a general loss of profits. H. L. Robertson & Associates, Inc. v. Plumbers Local 519, 74 LRRM 2689 (S.D.Fla., Dec. 9, 1969), aff'd, 429 F.2d 520 (5th Cir. 1970) (per curiam). It is now clear that, irrespective of state law, only com-

6. (e) It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible [sic] and void: *Provided*, That nothing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work . . . . .

7. Our understanding of what happened on the damage and other issues in this case below is hampered by a transcript that contains numerous uncorrected errors, followed by briefs and appendices that are most unhelpful (and as regards the briefs in violation of Fed.R.App.P. 28, in numerous respects). To the best of our understanding, it appears that the trial court's charge as to Landstrom's claims was somewhat different from the testimony adduced because in connection with the BOCES School, appellant's counsel in summation and the court spoke of twenty-seven *hundred* yards of gravel used there, as to which Landstrom would have delivered only one-half, making a loss of $1,012.50. The testimony of Mr. Pfister at pages 150 et seq. of the transcript, however, was that the total yardage on the project was twenty-two *thousand* seven hundred yards of which Landstrom would have delivered at least one-half. On this basis the loss sustained would have been $8,512.50. This discrepancy in the charge of $7,500 in favor of appellant was not objected to by appellee and may have been due to a mistake in transcribing the testimony rather than counsel's computations.

pensatory damages are recoverable in § 303 actions. Teamsters Local 20 v. Morton, 377 U.S. 252, 260–261, 84 S.Ct. 1253, 12 L.Ed.2d 280 (1964). It is equally clear that damages in a § 303 action need not be proven to a certainty, but only to an approximation inferable reasonably and justly. Flame Coal Co. v. UMW, 303 F.2d 39 (6th Cir.), cert. denied, 371 U.S. 891, 83 S.Ct. 186, 9 L.Ed. 2d 125 (1962); UMW v. Patton, 211 F. 2d 742 (4th Cir.), cert. denied, 348 U.S. 824, 75 S.Ct. 38, 99 L.Ed. 649 (1954). *See also* Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 567–568, 51 S.Ct. 248, 75 L.Ed. 544 (1931) (loss of business from Sherman Act violation). But here, with one minor exception,[8] appellee produced no evidence of out of pocket expense as in Gulf Coast Building & Supply Co. v. Electrical Workers Local 480, 428 F.2d 121 (5th Cir.), cert. denied, 400 U.S. 942, 91 S.Ct. 240, 27 L.Ed.2d 246 (1970), or Burns Brothers Plumbers, Inc. v. Groves Ventures Co., 412 F.2d 202 (6th Cir. 1969). There was no evidence produced that appellee did not or could not have employed his material elsewhere and used his trucks and men in connection with other projects not interfered with by appellant—no evidence that his men and equipment were idled by appellant's activity. The most that was shown is a lost gross profit, but not a loss of net income. The proof of damage here thus falls far short of that adduced by the general contractor in Abbott v. Pipefitters Local 142, 429 F.2d 786, 789–790 (5th Cir. 1970) (proof of average profit over three year period and less profit on particular job, coupled with proof that losses were not attributable to factors other than picketing). *See also* Sheet Metal Workers Local 223 v. Atlas Sheet Metal Co., 384 F.2d 101 (5th Cir. 1967); Teamsters Local 984 v. Humko Co., 287 F.2d 231 (6th Cir.), cert. denied, 366 U.S. 962, 81 S.Ct. 1922,

6 L.Ed.2d 1254 (1961). While there is ample proof that as a result of appellant's unlawful activity appellee sustained lost profits on some gravel that he could have sold at the pit and some that he could have delivered, there is no proof that the same gravel—surely the most fungible and widely used of minerals—was not sold elsewhere or in any event delivered elsewhere in the ordinary course of business by the use of Landstrom's men and equipment. Thus, appellee did not sustain his burden of proving actual damage.

■ Since we must remand in respect to alleged losses of profits in any event, it is unnecessary to determine whether the court's response to a jury question in respect to Landstrom's claim for damages should have been framed in substantially the same terms as Landstrom's attorney's summation. We do hold, however, that appellant's belated objections to evidence relating to liability and damages on the Spencer-Van Etten, Morris Chain and Unex Press jobs on the ground that they were not specifically mentioned in appellee's answers to interrogatories are unavailing. Reference was made in the interrogatory answers to claimed damages of $62,500 in respect to Stewart and Bennett, the Spencer-Van Etten contractors, and in connection with the Unex Press project there was a general answer of claimed damages of $25,000 on additional jobs; appellant cannot now claim, having failed to press for further specification before trial, that he was surprised by this evidence. Landstrom's deposition could have been, but was not taken. The Morris Chain project of which appellant now complains was not material since no claim for damages in respect to it was made.

Judgment affirmed as to liability, reversed and remanded for new trial on damages only, costs to neither party.

---

8. For mason sand Landstrom had to purchase at a higher cost—$222.50.