PENNANT MOLDINGS, INC., APPELLEE, v.
C & J TRUCKING CO., APPELLANT.

(No. CA 468—Decided August 24, 1983.)

*Messrs. Buckley & Miller* and *Mr. Jeffrey L. Wright,* for appellee.

*Messrs. Baker & Hostetler* and *Mr. Stephen J. Habash,* for appellant.

*Per Curiam.* This cause came on to be heard upon an appeal from the Wilmington Municipal Court, Clinton County, Ohio.

The instant case involves a shipment of slit steel coils from Newark Steel Co. (hereinafter "Newark") of Newark, Ohio, to plaintiff-appellee, Pennant Moldings, Inc. (hereinafter "Pennant"), located in Sabina, Ohio. Pennant ordered the slit steel for use in its business of manufacturing decorative trim for major appliances.

The delivery was initially assigned by Newark to Kaplan Trucking Co. (hereinafter "Kaplan"), a concern which possessed the required Public Utilities Commission of Ohio ("PUCO") authorization to deliver between Newark and Sabina. Kaplan in turn contacted defendant-appellant, C & J Trucking Co. (hereinafter "C & J"), a common carrier without PUCO authorization, to deliver between Newark and Sabina, and entered into a "trip lease arrangement" whereby C & J leased its equipment and driver to Kaplan for purposes of making the delivery. Kaplan's name and PUCO numbers were displayed on the sides of the delivery vehicle, as required by PUCO regulations.

C & J picked up the steel from Newark on July 10, 1979. A bill of lading was cut at this time naming C & J as the carrier. Delivery was made to Pennant in Sabina the same day. Charles Groves, Pennant's plant superintendent, supervised the unloading and testified that he observed that a number of the coils were wet, allegedly due to being covered with poor grade tarpaulins. After the steel was unloaded, Groves signed the bill of lading, retaining one copy and leaving another copy with the driver. Groves testified that it was his usual practice to note any defects in goods delivered on the corresponding bill of lading, but he made no

such notation on the bill of lading representing the steel in the case at bar. Pennant subsequently received invoices from Newark for the cost of the steel delivered indicating that C & J was the carrier. Pennant also received a freight bill for the cost of delivery sent by Kaplan which indicated that C & J was the carrier.

After its arrival at Pennant, the wet steel began to rust, rendering portions of it unusable. On October 29, 1979, about three and one-half months after delivery, appellee sent a claim of loss and damage form to appellant. Charles Boggs, President of C & J, testified that the form was probably forwarded to Kaplan because the claim was not C & J's responsibility. C & J made no effort to notify appellee that the damage claims had been sent to the wrong carrier; Boggs felt that Kaplan would so notify Pennant. C & J did, however, send one of its employees to Pennant to inspect the damage prior to the filing of the claim. The employee was accompanied by Everett Smith, President of Newark Steel.

The damage claim resulted in the return of the totally unusable portion of the steel by truck to Newark on October 24, 1979. The same driver who made the original delivery handled the return, although that time no trip lease arrangement was involved, as C & J had in the interim secured PUCO authority to haul freight between Newark and Sabina. Appellee used the remainder of the steel in its manufacturing process; the portions of the steel found to be unusable were sold as scrap.

Pennant brought the action below charging C & J with negligence in preparation of the steel for shipment in that it was improperly protected from the elements, causing rust damage thereto. The trial court found for appellee in the amount of $3,690. C & J excepts from the decision below, and has timely filed this appeal presenting the following three assignments of error:

"First Assignment of Error:

"The trial court erred to the prejudice of defendant-appellant in overruling its motion for dismissal made pursuant to [Civil] Rule 41(B)(2) and in finding defendant-appellant liable for negligence.

"Second Assignment of Error:

"The trial court erred to the prejudice of defendant-appellant in awarding any damages to plaintiff-appellee."

"Third Assignment of Error:

"The trial court erred to the prejudice of defendant-appellant in awarding damages in a sum certain."

The fundament of appellant's first assignment of error is that appellee sued the wrong party below due to the trip lease arrangement between Kaplan and C & J. While we agree that Kaplan is liable for the loss as between Kaplan and C & J, this does not relieve C & J of liability to a third party.

Liability of common carriers for damaged freight is governed by R.C. 4965.54. PUCO has supplemented the above legislation with a series of administrative rules contained in Ohio Adm. Code Chapter 4901:2, entitled "Motor Carriers." In a liability contest between C & J and Kaplan, PUCO regulations clearly place the loss on the authorized carrier, which is Kaplan. Ohio Adm. Code 4901:2-3-03(A)(3) states that agreements which involve an authorized carrier performing authorized transportation in vehicles which it does not own must:

"* * * provide for the exclusive possession, control and use of the equipment during the full period of the lease, and for the complete assumption on the part of the lessee of full responsibility in respect of said equipment during the period of the lease to the public, the shipper, and the Public Utilities Commission of Ohio * * *."

The agreement must also provide for the exclusive control of the driver by the lessee while he is operating the equipment covered by the lease. Ohio Adm. Code 4901:2-3-03(A)(3).

However, the case now before us does not involve the apportionment of liability between a lessor and a lessee, but a dispute between a common carrier and a third-party receiver of goods delivered. In this situation, Ohio law places liability for loss on the carrier. R.C. 4965.54 reads as follows:

"Any common carrier, railroad, or transportation company receiving property at a point within this state for transportation to a point within this state, shall issue a receipt or bill of lading for such property and is liable to the lawful holder of it for any loss, damage, or injury to such property * * *."

The regulations contained in the Ohio Administrative Code governing lease agreements between PUCO authorized carriers and other carriers are rendered inapplicable in a suit between a common carrier and a receiver by the following language:

"No contract, receipt, rule, or regulation shall exempt such common carrier, railroad, or transportation company from the liability imposed by this section." (R.C. 4965.54.)

We feel compelled to discuss two points relevant to the application of R.C. 4965.54 to the case *sub judice*. First, the term "common carrier" is not defined in the Revised Code for purposes of the statute cited above. In this situation, we can only conclude that the Ohio General Assembly intended that the common-law definition of "common carrier" apply. If a specialized definition was desired, it would certainly have been provided. A common carrier at common law includes any carrier which "seeks the privilege of transporting for hire the goods of the public * * *." *Morrisey* v. *S. S. & A. & J. Faith* (N.D. Ohio 1965), 252 F. Supp. 54, 56. We think C & J satisfies the definition above, and is therefore a common carrier for purposes of R.C. 4965.54.

The second point involves the operation of the term "bill of lading" in R.C. 4965.54. In the case at bar, the record reveals that the bill of lading, which was issued when C & J picked up the steel from Newark, incorrectly indicated that C & J, not Kaplan, was the carrier. Although the statute requires that a bill of lading be issued, it does not condition the liability of the carrier on the premise that the document be accurate in all respects. R.C. 1301.08 (UCC 1-202) supports this interpretation, as it states that a bill of lading constitutes only *prima facie* evidence of its own authenticity and of the facts stated therein. Official Comment 3 to R.C. 1301.08 reads in pertinent part:

"The provisions of this section go no further than establishing the documents in question as prima facie evidence and leave to the court the ultimate determination of the facts where the accuracy or authenticity of the documents is questioned. * * *"

Therefore, we find that R.C. 4965.54 places liability for the damaged steel with appellant C & J.

We are aware that our conclusion fails to conform to the PUCO regulatory scheme for authorized carriers as advanced in Ohio Adm. Code Chapter 4901:2-3. However, we feel that the unique circumstances present in the case at bar justify such a result. First, appellee had many reasons for making a good faith error as to which carrier was responsible for the loss. The bill of lading incorrectly indicated that C & J was the carrier, and the steel was delivered by a driver known by Pennant to be a C & J employee. Invoices from Newark listed the carrier as C & J. The freight bill was sent by Kaplan, but also listed C & J as the carrier. An employee of C & J inspected the damaged steel, and a C & J truck, driven by the same driver who made the original delivery, picked up the unusable portion of the steel and returned it to Newark. Second, appellant failed to timely disclose to Pennant that Pennant was suing the wrong carrier. There was no such disclosure in appellant's answer, which simply denied each of appellee's material

allegations. Instead, C & J waited until the trial below to advise appellee that it was merely a lessor to Kaplan. By this time, Pennant was barred by statute from bringing suit against Kaplan. We refuse to condone such tactics.

Thus, the trial court properly overruled appellant's motion to dismiss and found C & J liable for Pennant's loss. Appellant's first assignment of error is therefore overruled.

Appellant's second assignment of error asserts that no damages should have been awarded because appellee failed to timely notify appellant that the steel was wet when delivered. This omission purportedly deprived appellant of the opportunity to inspect the damaged coils and to take any possible action to mitigate such damage. The evidence establishes that appellee received the steel on July 10, 1979, and sent a damage claim to C & J on October 29, 1979, which was subsequently forwarded to Kaplan. The evidence further indicates that at an undetermined time prior to the mailing of the damage claim, Everett Smith, President of Newark and a C & J employee, inspected the alleged rust damage at Pennant's warehouse in Sabina.

The burden of showing error rests upon the party claiming error on appeal. In the absence of such an affirmative showing, this court is bound to presume that the court below reached a proper result. *State, ex rel. Fulton,* v. *Halliday* (1944), 142 Ohio St. 548 [27 O.O. 487]; *Claycraft Co.* v. *Lowe* (C.P. 1952), 72 Ohio Law Abs. 225. No evidence was presented at trial to indicate when appellee first notified C & J or Kaplan or Newark that the steel was wet and rusting. Nevertheless, it is clear that Newark and C & J knew of the damage before the claim form was mailed. As the issue of timely notice was not explicitly raised and argued below, it may not be raised for the first time on appeal. See *Shibley* v. *Time, Inc.* (1975), 45 Ohio App. 2d 69 [74 O.O.2d 101], and *Woelfling* v. *Great-West Life*

*Assurance Co.* (1972), 30 Ohio App. 2d 211 [59 O.O.2d 351]. Therefore, appellant's second assignment of error is hereby overruled.

Appellant's third assignment of error concerns the propriety of the damage award below. It asserts that the award was based on highly speculative estimates and is therefore improper. We perceive this assignment of error as encompassing three distinct issues: (1) whether certain slit steel coils were in fact returned to Newark; (2) whether appellee failed to take proper steps to mitigate any damage incurred; and (3) the value assigned to the portion of the steel scrapped by Pennant.

We believe the evidence below indicates that all of the slit steel coils that were to be returned to Newark by Pennant were in fact returned by truck on October 24, 1979. The uncertainty stems from the fact that the delivery receipt for such steel indicates that five coils of .040 × 1.500″ steel were returned instead of five coils of .030 × 2.000″ steel. However, the uncontroverted testimony of Marjorie Groves, an employee of Pennant, indicates that the correct steel was placed on the truck, but five rolls were incorrectly described on the receipt due to a clerical error. Further, there is no evidence indicating that Newark received steel from Pennant other than the steel it expected Pennant to return as damaged.

It is true that those damaged in person or property must take all reasonable steps to minimize such damages. *Maloney* v. *General Tire Sales, Inc.* (1973), 34 Ohio App. 2d 177 [63 O.O.2d 289]. Appellant asserts that appellee should have oiled the wet steel upon receipt to retard rust damage thereto, and integrated such steel into the production process as quickly as possible. However, no evidence was presented as to how much effect oiling the steel upon receipt would have had on the subsequent rust damage, or as to how quickly the steel could have been used by Pennant. These issues were not explicitly raised and argued below, and thus may

not be raised for the first time on appeal. See *Woelfling* and *Shibley, supra.* In the absence of an affirmative showing of error, we must presume the court below reached a proper result. See *Fulton* and *Claycraft, supra.*

The trial court awarded damages to appellee in the amount of $3,690. However, the opinion fails to indicate how the trial court arrived at this figure, and consequently does not show the amount allowed Pennant for the 6,869 pounds of steel sold as scrap. Groves testified below that at the time of trial Pennant was receiving 1 to 1.25 cents per pound for scrap steel. Groves further testified that the above amount was probably lower at the time the steel in the case *sub judice* was scrapped. No other evidence as to the amount received for the scrapped steel was presented.

Once a right to damages has been established, such right will not be denied because the damages are incapable of being calculated with mathematical certainty. *Burns Brothers Plumbers, Inc.* v. *Groves Ventures Co.* (C.A. 6, 1969), 412 F. 2d 202 [50 O.O.2d 180]. We are satisfied that appellee presented sufficient evidence to show entitlement to damages in an amount ascertainable with reasonable certainty. We further find that the damages awarded below adequately compensate appellee without any prejudice to appellant. Therefore, the damage award of the trial court is sustained, and appellant's third assignment of error is not well-taken.

The assignments of error properly before this court having been ruled upon as heretofore set forth, it is the order of this court that the judgment herein appealed from be, and the same hereby is, affirmed.

*Judgment affirmed.*

HENDRICKSON, P.J., KOEHLER and JONES, JJ., concur.