8

**BLUE RIBBON REMODELING COMPANY**

v.

**MEISTRICH.**

Hamilton County Municipal Court.

No. 97CV03566.

Decided Jan. 21, 1999.

*Joseph G. Carr,* for plaintiff Blue Ribbon Remodeling.

*Michael L. Weber,* for defendant David Meistrich.

ELIZABETH B. MATTINGLY, Judge.

This matter came on for trial on plaintiff's complaint for damages pursuant to a contract that it entered with defendant to install some concrete piers at his apartment buildings located on a hillside in the Hyde Park area of Cincinnati. Plaintiff Blue Ribbon asserts that it is entitled to a recovery based on contract and, in the alternative, based on quantum meruit for the work it performed in the amount of $9,000. Defendant Meistrich urges the court to award a refund of the $3,000 down payment he paid on the contract, asserting that the contract was void because it was not timely completed. Moreover, since the work was only partially completed, defendant urges that Blue Ribbon is not entitled to any recovery under the theory of quantum meruit.

Sometime in the fall of 1994, defendant Meistrich obtained an estimate from plaintiff Blue Ribbon Remodeling (hereinafter referred to as "Blue Ribbon") to fix foundation cracks that had developed in some apartment buildings he owned at 5015, 5009 and 5025 Shattuc Avenue. The President of Blue Ribbon is Mr. Fred Haboush. Haboush had twenty-eight years' experience in remodeling and underpinning. He inspected the hillside and concluded that piers were needed to stabilize the foundations of the buildings. Blue Ribbon submitted a bid to do the necessary work; defendant Meistrich accepted the bid, since it was the lowest bid for completing the job.

On November 7, 1994, defendant Meistrich entered a contract with plaintiff Blue Ribbon pursuant to which Blue Ribbon agreed to install concrete piers to shore up the foundations of defendant's apartment building at 5015 Shattuc Avenue. This contract called for Blue Ribbon to reinforce the foundation with the installation of seven piers, each five to six feet deep.[1] The cost of the piers was $900 each, for a total due of $6,300. Defendant Meistrich paid plaintiff a $3,000 deposit on the work. The contract set no specific date for completion of the project; however, defendant Meistrich was told that the job could be completed in a few weeks.

Sometime in November 1994, plaintiff began digging holes for the piers. When four of the piers were already dug, an inspector from the city of Cincinnati told the workers to stop working because he had determined that the permit and engineer's drawings required by the city of Cincinnati had not been secured, and the piers that Blue Ribbon proposed to install did not meet code requirements. The inspector told Blue Ribbon that $4 \times 4 \times 6$ piers were required and no more

---

1. Although there was some testimony from Haboush that the piers envisioned in the first contract would be 2.5 feet deep, it appears he may have meant 2.5 × 2.5 feet in length and width.

work could be done until the necessary permits and drawings were submitted to the city. Meeting these requirements would cost additional money.

At that point, Blue Ribbon went to defendant and informed him that it could not do the work as now required by the city of Cincinnati for the price stated in the contract. Defendant Meistrich, concerned that holes had already been dug and dirt moved, agreed to a second contract, dated December 29, 1994, to get the job completed as expeditiously as possible. The second contract required Blue Ribbon to install additional piers as specified in the engineer's drawings and the requirements of the building inspector. All work would be inspected by the engineer and building inspector, with all work to pass inspection and Blue Ribbon to provide all necessary materials. The new agreement called for installation of twelve piers for $12,000 with the original down payment applied against all sums due under the new contract.[2]

Work on the project proceeded, and there were concrete pours in January and February 1995. Soon thereafter, Harry Waggers and Bob Noble, the two subcontractors of Blue Ribbon who were digging the holes on the job, quit the work, citing the slippery and dangerous condition of the hillside on which the apartments were located. They did not work on the project after early February.[3] Haboush testified that there were "snow and rain," explaining that when it rains, it is impossible to dig with a backhoe, especially in a hillside area. The weather was typical for the Cincinnati area in January and February.

In late February or early March 1995, Blue Ribbon got another subcontractor, Bill Richardson, to work on the project. Richardson had worked for Blue Ribbon as a subcontractor on several occasions over two years on fifteen or twenty jobs. Richardson worked on the Shattuc project until June 6, 1995 at the latest. Although he continued to work there sporadically, and several dates were set for concrete to be poured, no concrete was poured after February 1995.[4] Haboush did pay Richardson after the January 29, 1995 deadline had passed. It has not been established by a preponderance of the evidence what Richardson specifically

---

2. The second payment on the second contract was apparently proposed to be made nine months from the date of the contract (sometime in September 1995), but this provision is scratched out by interlineation and initialed "F.H." in the original. The court finds that while this term was proposed, it was deleted by the parties. Final payment was due nine months from the date the contract was entered.

3. The court notes that the last payment to Noble on this project is check No. 1929 dated February 8, 1995.

4. Fred Haboush testified that he purchased concrete for his jobs from Ideal Concrete. The only checks submitted in evidence with Ideal Concrete as payee are No. 1890 dated January 12, 1995 for $313.87 and No. 1938 dated February 21, 1995 for $292.03.

accomplished during this period.[5] The parties agree that the work was not completed by January 29, 1995, the date specified for completion in the contract.

On July 1, 1995, defendant Meistrich hired Richardson to complete the work of installing the piers and to do additional work as well.[6] When Blue Ribbon demanded full payment on its contract later in the summer, defendant Meistrich refused to pay the balance due under the December 29, 1995 contract, since the agreement was void, the plaintiff not having completed the work by the time required in the contract. Moreover, he had already paid Richardson for his work on the job.[7]

Blue Ribbon was unaware until after this lawsuit was filed that Richardson had entered into a contract with Meistrich to finish the job.[8] Plaintiff states that when defendant hired Richardson, he violated a specific term of the agreement they had entered.

Twenty-five checks drawn on Blue Ribbon were presented as evidence in court of the expenses paid by Blue Ribbon on the job at issue. The court notes that only eighteen of the checks reference the Shattuc Avenue job, and some of the checks contradict testimony adduced at trial.[9]

What seems clear from the testimony of both Haboush and defendant Meistrich is that from and after late February or early March 1995 when Richardson began to work on the job for Blue Ribbon, neither party spoke to the other about the legal status of the contract. Defendant Meistrich did not inform Blue Ribbon that he considered their agreement void at any time prior to entering an agreement with Richardson.[10] Both parties maintain they were ultimately unable

---

5. The court specifically finds incredible Haboush's testimony that between February and July, three piers were poured and one hole dug, since there is no evidence that he visited the Shattuc job during this period and there are no checks in evidence for delivery of concrete.

6. The contract with Richardson covered defendant's properties at 5009, 5015 and 5025 Shattuc Avenue and called for piers to be dug in accordance with engineer's drawings, which drawings were not submitted as evidence in this case. The contract also called for repairing walls, tuckpointing floors and chimneys, and reseeding the lawn and providing top soil.

7. Defendant Meistrich's uncontradicted testimony is that Richardson too left the job unfinished.

8. At this point in time, Richardson cannot be found by either party.

9. For example, Plaintiff's Ex. 2B and C are payable to Bill Richardson and are dated January 5, 1995 and January 11, 1995, yet the undisputed testimony is that Richardson did not work on the Shattuc job until late February or early March 1995, when Noble and Waggers had already quit the project. Moreover, plaintiff's Ex. 2H dated December 30, 1994 is described on the memo line as a loan and was written when Richardson was not working on the Shattuc job.

10. They did talk about concrete pours that might be occurring, but neither testified to any conversation about the ongoing status of the contract. Defendant Meistrich did note his expressed complaints about the slow progress on the project.

to contact the other party despite numerous attempts.

Two specific provisions of the December 29, 1994 contract are relevant to the main issues for decision here. The first that governs the completion date of the work is as follows:

"Contractor agreed to complete the work set forth herein on or about [the] 29[th] day of January, 1995 subject to the availability of material, labor, weather condition or other circumstances beyond the control of Blue Ribbon Remodeling Company, Inc. Otherwise, the contract is void."

The second provision deals with defendant's inability to contract directly with any employees or agents of plaintiff. This section states in part as follows:

"Owner shall not contract with employees or agents of Contractor to perform work (whether or not said work is covered by this contract) for them while any condition of this contract remains to be performed by either Contractor or Owner."

The court finds that time was of the essence in the agreement made by the parties dated December 29, 1994. Plaintiff. was required to complete the work by January 29, 1995, unless certain conditions interfered with his performance. Blue Ribbon entered this contract during the winter and agreed to complete the work during a winter time frame. The weather conditions that Blue Ribbon experienced were typical for Cincinnati in the winter months. Blue Ribbon had twenty-eight years of experience in the field of underpinning foundations and had inspected the premises thoroughly before each contract was entered. Although Noble and Waggers quit in mid- to late February, Blue Ribbon was able to promptly secure the services of Richardson to work on the job. There is no evidence that Richardson experienced any "circumstances beyond his control that impeded completion of the job." Richardson was unable to complete the work due to a lack of concrete to pour into the holes he had dug, a factor under the control of Blue Ribbon.[11] Even if weather conditions excused Blue Ribbon's performance in January, there was no evidence offered by Blue Ribbon of any impediment to completion when the weather became better later in the spring. In addition, Blue Ribbon was in breach due to its failure to provide concrete to the job from and after February 21, 1995. As a result, the court finds that Blue Ribbon's contract with defendant Meistrich became void on January 29, 1995 or within a month after that date.[12]

---

11. No credible explanation was given as to why the concrete was not delivered.

12. As Robert Noble testified, it takes only three days to complete a footer. In addition, the parties obviously believed that the total job could be completed in one month, as they agreed in the December 29, 1994 contract.

**14**

■ In the face of a void contract, Blue Ribbon continued intermittently to provide Richardson work on the Shattuc job.[13]  Since the contract was void by its terms, defendant Meistrich was not required to take any specific action to notify Blue Ribbon that he considered the contract void or that he intended to get the job finished by another company.[14]  It is noteworthy that the parties used the word "void" as opposed to "voidable."  "Void" means that the contract is ended, not simply finished at the instance of the aggrieved party.  In view of the clear term in the contract, Blue Ribbon took the risk that defendant Meistrich's silence and possible waiver of the time constraints would cease at some point in the future.

■ Since his contract with Blue Ribbon was void when defendant Meistrich entered into an agreement with Richardson on July 1, 1995, defendant Meistrich was not bound by any of the terms of his former agreement.  Moreover, Richardson had ceased to work on the Shattuc job in early June 1995[15] at the latest.  When Meistrich contracted with Richardson to work on the Shattuc job, he was neither an agent nor an employee of that enterprise.  Accordingly, even if the nonhiring clause was applicable to defendant Meistrich, it did not bar his agreement with Richardson.

For all these reasons, the court finds that plaintiff is not entitled to collect the balance due under its contract dated December 29, 1994 from defendant Meistrich.  The question remains as to whether it is entitled to monies from defendant Meistrich under the theory of quantum meruit.

■ Quantum meruit is an equitable doctrine based upon the concept that a party should not be unjustly enriched at the expense of another.  *Paugh & Farmer, Inc. v. Menorah Home for Jewish Aged* (1984), 15 Ohio St.3d 44, 15 OBR 142, 472 N.E.2d 704, To prevent such unjust enrichment, the law implies a promise to pay for the reasonable value of services rendered in the absence of a contract for such services.  Quantum meruit is not predicated upon the existence of a contract.  *Brune–Harpenau–Torbeck Builders, Inc. v. Torbeck* (Dec. 24, 1998), Hamilton App. No. C–971072, unreported, 1998 WL 892240.

---

**13.**  According to evidence submitted by plaintiff, Richardson received only sporadic payments after March 1995 and only $200 after May 1, 1995.  No concrete was provided during this period.

**14.**  It may well be that defendant Meistrich waived the provision of the contract that time was of the essence for some period of time.  Even if there was a waiver initially, it ended on or before July 1, 1995.

**15.**  The last check paid to Richardson for work done on the Shattuc job was for $100 and is dated June 6, 1995.

■■  Defendant urges that since the contract here was only partially performed, quantum meruit is inapplicable. The traditional rule is that where a party has partially but not substantially performed his promise contained in an entire contract, and the failure to perform the balance of the contract is not excused, no recovery can be had upon a quantum meruit theory. 18 Ohio Jurisprudence 3d (1980), Contracts, Section 231. The theory of the rule is that courts will not encourage the intentional and unjustifiable breach of an agreement and allow the breaching party to recover for part performance of a contract that is entire, where the other contracting party is not in fault and has not waived a full performance by acceptance or otherwise. *Goldsmith v. Hand* (1875), 26 Ohio St. 101. Nevertheless, Ohio courts have noted that the drastic rule of forfeiture against a defaulting contractor who has by his labor and materials materially enriched the estate of the other, should, in natural justice, be afforded relief to the reasonable value of the work done, less whatever damages the other party has suffered. *Kirkland v. Archbold* (Ohio App.1953), 113 N.E.2d 496 (Cuyahoga Cty.).

.Several appellate courts of Ohio and clearly a majority of those recently considering the issue have adopted the modern rule that even where a subcontractor has not substantially performed his contract, he may recover the reasonable value of improvements made, less any damages suffered, where the work which the subcontractor did do conferred a substantial and permanent benefit upon the other party to the contract. *Murray v. Marbro Builders, Inc.* (1977), 53 Ohio App.2d 1, 7 O.O.3d 8, 371 N.E.2d 218; *Thermal Master, Inc. v. Greenhill* (Sept. 29, 1987), Franklin App. No. 86AP–745, unreported, 1987 WL 17801; *W. Coast Indus. Relations Assn. Inc. v. Superior Beverage Group* (1998), 127 Ohio App.3d 233, 712 N.E.2d 770; *Systemation, Inc. v. Broadview S. & L. Co.* (Dec. 1, 1983), Cuyahoga App. No. 46314, unreported, 1983 WL 2863; *Spitzer v. Forrester* (Oct. 19, 1981), Montgomery App. No. 7087, unreported, 1981 WL 2572; and *Celinski v. Benke* (Nov. 29, 1996), Ashtabula App. No. 96–A–0020, unreported, 1996 WL 760918.

The two cases that have not followed this trend are *Miller v. Bealer* (1992), 80 Ohio App.3d 180, 608 N.E.2d 1133 (Wayne Cty.), and *Wagner v. Block* (1995), 107 Ohio App.3d 603, 669 N.E.2d 272 (Erie Cty.). In neither case is the rationale of the traditional rule discussed. In addition, the facts in *Miller* which deal with the incomplete repair of an automobile do not readily demonstrate that any value was permanently conferred as required by the modern rule. Similarly, the facts in *Wagner* concern the collection of legal fees outstanding when an attorney resigned from representation. The traditional rule was cited in dicta only for the proposition that a specific rule concerning attorney contracts tracked the general law of contracts.[16]

---

16. The rule in question is that if the attorney does not see the matter to conclusion and voluntarily withdraws without just cause, then a breach has occurred and he may not be entitled to compensation for work already completed. *Wagner, supra.*

This court finds that the modern rule is more equitable and should be applied here.

The court finds that the efforts of Blue Ribbon did confer a permanent benefit on defendant Meistrich in that four piers were completed by Blue Ribbon prior to the contract's becoming void. The parties had agreed on a price of $1,000 per pier in the December 29, 1994 contract, and defendant Meistrich had paid only $3,000 to plaintiff for his work. The court finds that quantum meruit requires that defendant pay an additional $1,000 to plaintiff Blue Ribbon for the four piers.[17]

There is no proof that defendant Meistrich was damaged by having to secure completion of the work by others. The price he paid Richardson was lower than what he had agreed to pay on his second contract with Blue Ribbon,[18] and the contract with Richardson encompassed additional work.

The parties shall draft an entry reflecting these findings and present it to the court for signature within fourteen days of this decision.

SO ORDERED this 21st day of January, 1999.

*Judgment accordingly.*

---

17. Presumably, the contract price of $1,000 per pier takes into account the wages and materials expenses that Blue Ribbon expected to expend on the project. No additional award will be made to account for those expenses. Moreover, as the court has previously found, whatever work Richardson actually completed has not been proven by a preponderance of the evidence.

18. The Blue Ribbon contract called for $1,000 per pier; the contract with Richardson required completion of approximately nineteen additional piers, reseeding, tuckpointing, and other services for $11,500, only $10,500 of which was paid.