OPINION
{¶ 1} This lawsuit was filed by Auto-Owners Insurance Company ("Auto-Owners") as a subrogation action to recover the amount of $78,750, which was paid to William Stoneman and Rochelle Stoneman (collectively referred to as "the Stonemans") after the horse arena being constructed for them by John R. Wheatley, d.b.a. Wheatley Construction ("Wheatley") collapsed.
 {¶ 2} Wheatley, in turn, sued the Stonemans in the same litigation for the amount due under the contract to construct the horse arena that had collapsed. An additional claim against the Stonemans alleged that they had committed a forgery against Wheatley. Wheatley also sued Auto-Owners for breach of contract and for the wrongful issuance of an IRS Form 1099, which resulted in additional tax liability to him.
 {¶ 3} Finally, the Stonemans sued Wheatley for damages to recover for negligent construction of their arena, for breaches of two contracts, and for fraudulent misrepresentations.
 {¶ 4} The court below rendered judgment to Auto-Owners in the amount of $78,750 against Wheatley. It also rendered judgment in favor of Wheatley in the amount of $27,468.62 against the Stonemans. It rendered judgment in favor of Auto-Owners with respect to the breach of contract claim and the "1099 claim" against it by Wheatley and rendered judgment against the Stonemans on their claim for negligent construction and breach of contract against Wheatley. Finally, it held that there had been no forgery committed by the Stonemans. For the reasons that follow, we modify the judgment of the trial court and affirm the judgment as modified.
 {¶ 5} The matter was heard before a magistrate. The parties had agreed prior to the hearing that the decision of the magistrate would be binding upon them and their rights to file objections to his decision were waived. The court adopted the magistrate's decision, and the matter is now in this court upon an appeal and a cross-appeal.
 {¶ 6} The Stonemans contracted with Wheatley for the construction of a horse arena in the spring of 2000. They agreed to pay Wheatley the cost of materials plus $10,000 for his labor as the total price for the construction. On October 8, 2000, the barn collapsed. There was testimony from a civil engineer hired by Auto-Owners that the reason the barn collapsed was due to negligent construction by Wheatley; and the magistrate found that "it was due to [Wheatley's] negligent construction that the building collapsed."
 {¶ 7} Auto-Owners calculated the replacement cost of the arena at the time of its collapse to be $76,862; however, its coverage with the Stonemans was limited to $75,000, plus another 5% for cleanup costs, so it determined its total obligation to be $78,750, consisting of $75,000 to replace the arena and $3,750 for removal of debris. Auto-Owners issued two checks in payment of this claim. One check was issued for $50,000, and the other check for $28,750. Both checks had the Stonemans and Wheatley as payees. Auto-Owners also required the parties to memorialize their oral agreement in order to state a sum certain for their agreement. The parties did so and created a document to reflect their agreed upon price for construction of the horse arena to be $83,500.
 {¶ 8} Thereafter, the Stonemans and Wheatley entered into a second contract, this time in writing, for construction of the horse arena. This second arena was to cost the Stonemans $60,000. The reason for the difference in price between the first arena project and the second arena project was that much of the material from the first project was still usable in the second project. Two weeks after the contract for the second project was entered into, the Stonemans paid Wheatley the sum of $50,000.
 {¶ 9} Wheatley and his crew walked off the second project on January 23, 2001, and the Stonemans expended the sum of $23,972.50 to finish the project. The magistrate found this amount to be "reasonable and necessary to complete the construction of the horse arena and remedy some of the negligent aspects of Wheatley's construction." He also found that the Stonemans' total out-of-pocket expense for both construction projects was $56,031.38.
 {¶ 10} In awarding Wheatley the sum of $27,468.62 on his breach of contract claim against the Stonemans, the magistrate deducted the Stonemans' out-of-pocket expense, or $56,031.38, from the original contract price for the construction of the horse arena, which it considered to be $83,500, and computed the net figure as the award.
 {¶ 11} The Stonemans' first assignment of error is as follows:
 {¶ 12} "The trial court erred by granting judgment to Wheatley on his breach of contract claim against the Stonemans."
 {¶ 13} As a reviewing court, we will uphold the judgment of the trial court and will not find it to be contrary to the weight of the evidence if there is some competent and credible evidence to support the judgment.[1]
 {¶ 14} We note at the outset that there is a discrepancy between the amount found by the magistrate to have been expended out of pocket by the Stonemans and the amounts comprising that total in the testimony at trial. The magistrate found that the Stonemans had out-of-pocket expenses for the two arenas of $56,031.38, whereas the unchallenged testimony was that the Stonemans paid Wheatley a $15,000 down payment, paid $10,318.88 for steel, paid $3,500 for crane rental, paid $6,540 for debris removal, and an additional $23,972.50 to complete construction of the second arena after Wheatley walked off the job. The total of these figures is $59,331.38, and not $56,031.38.
 {¶ 15} The Stonemans emphasize the fact that Wheatley sued them only pursuant to the first agreement, and that because his negligence caused the first arena to collapse, this same negligence put him in breach of the first agreement and, therefore, he is not entitled to any recovery, citing W. Wagner G. Wagner Co., L.P.A. v. Block.[2] The Stonemans argue that they contracted for a new horse arena and received in return only a pile of rubble, so Wheatley should recover nothing, because they got nothing for their money.
 {¶ 16} In order to properly analyze this assignment of error, we invoke certain principles of contract law to assist us.
 {¶ 17} First of all, we invoke the principle of quantum meruit to prevent unjust enrichment of the Stonemans, at the expense of Wheatley:
 {¶ 18} "Quantum meruit is an equitable doctrine based upon the concept that a party should not be unjustly enriched at the expense of another."[3]
 {¶ 19} The court in the Blue Ribbon case, with a fact situation similar to the one in this case, discussed various approaches considered by the courts to apply the doctrine of quantum meruit and to determine the amount of contract damages where there is less than full performance:
 {¶ 20} "The traditional rule is that where a party has partially but not substantially performed his promise contained in an entire contract, and the failure to perform the balance of the contract is not excused, no recovery can be had upon a quantum meruit theory. * * * The theory of the rule is that courts will not encourage the intentional and unjustifiable breach of an agreement and allow the breaching party to recover for part performance of a contract that is entire, where the other contracting party is not in fault and has not waived a full performance by acceptance or otherwise. * * * Nevertheless, Ohio courts have noted that the drastic rule of forfeiture against a defaulting contractor who has by his labor and materials materially enriched the estate of the other, should, in natural justice, be afforded relief to the reasonable value of the work done, less whatever damages the other party has suffered. * * *
 {¶ 21} "Several appellate courts of Ohio and clearly a majority of those recently considering the issue have adopted the modern rule that even where a subcontractor has not substantially performed his contract, he may recover the reasonable value of improvements made, less any damages suffered, where the work which the subcontractor did do conferred a substantial and permanent benefit upon the other party to the contract."[4]
 {¶ 22} Notably, the two recent cases that have chosen not to follow the modern rule just cited are the two cases cited by the Stonemans in their first assignment of error. We believe that the modern rule avoids the harsh result of forfeiture, and we choose to follow it instead of the traditional rule.
 {¶ 23} The one difficulty, however, in applying the modern rule of quantum meruit to this case, where the contractor did not fully perform his contract due to his own negligence in causing the arena to collapse, is that at the point where the contractor, Wheatley, stopped performing the first contract, there was no substantial and permanent benefit conferred upon the other party to the contract, the Stonemans. At the point of collapse of the building, the replacement cost of the building was $76,862, and to that point the Stonemans had out-of-pocket expenses of $35,358.88. If we were to stop there, the measure of damages to Wheatley would be zero, because he had constructed a building that had collapsed; and the measure of damages to the Stonemans would be $35,358.88, because that is what it cost them to that point for the work performed by Wheatley.
 {¶ 24} Two things intervene at this point to shore up the quantum meruit approach. First of all, there is the duty on the part of the Stonemans to mitigate damages: "[i]t is true that those damaged in person or property must take all reasonable steps to minimize * * * damages."[5]
Secondly, there are the unique circumstances of this case, where the parties, following the collapse of the first horse arena, entered into a second contract to complete the construction of the horse arena originally sought by the Stonemans.
 {¶ 25} Therefore, contrary to the Stonemans' inclination to treat the first contract in isolation because Wheatley only pursued damages under the first contract in his complaint, the better approach is the one adopted by the trial court, which in effect consolidated the two contracts, or treated them as a contract within a contract, for purposes of its decision. Clearly, the testimony and the evidence at the hearing below did not limit itself to the first contract, but covered all the dealings and transactions of the parties from the spring of 2000, when the first oral agreement was entered into, until January 23, 2001, when Wheatley walked off the job.
 {¶ 26} If we follow the logic of the trial court's decision, we arrive at the same conclusion: (1) If one were to treat the horse arena on the date of collapse (October 8, 2000) as a nearly completed structure, then Wheatley should be able to recover the difference between the replacement cost ($76,862) representing the reasonable value of the services performed by him to that date, and the amount expended by the Stonemans to that date ($35,358.88), for a net recovery to Wheatley of $41,503.12; and (2) then, on the date of collapse (October 8, 2000), the Stonemans can be credited with honoring their duty to mitigate damages by entering into a new agreement with Wheatley to finish construction of the horse arena, and this new agreement called for a total price of $60,000.
 {¶ 27} Unfortunately for the Stonemans, Wheatley walked off the job during the pendency of the second contract, and the Stonemans were required to spend an additional $23,972.50 to complete the job. In addition to the $50,000 the Stonemans paid to Wheatley toward the cost of the second arena, therefore, the Stonemans were out-of-pocket $73,972.50 for an arena which should have cost only $60,000. The measure of damages with respect to the second arena, therefore, is $13,972.50 in favor of the Stonemans. When the two measures of damages are netted against each other, the amount of $41,503.12 is reduced by $13,972.50, for a net recovery to Wheatley of $27,530.62. This compares to the figure of $27,468.62 arrived at by the magistrate, but this latter figure is based on an arithmetic error, discussed above, so we opt for the figure of $27,530.62, and modify the judgment accordingly pursuant to our general power to "review, affirm, modify, set aside, or reverse judgments."[6]
 {¶ 28} By calculating damages to Wheatley in this way, not only has the trial court adopted the legal principles espoused above (quantum meruit and duty to mitigate damages), but it has tailored them to the unique fact situation in this case.
 {¶ 29} This method of analyzing the two contracts only reinforces the correctness of the trial court's decision. That decision found that Wheatley's construction of the first horse arena was negligent, and that the expenses incurred by the Stonemans to complete construction of the second horse arena were reasonable and necessary. As in any other civil case, "`judgments supported by some competent, credible evidence going to all the essential elements of the case'" will not be reversed by a reviewing court "`as being against the manifest weight of the evidence.'"[7]
 {¶ 30} For the above reasons, we find the first assignment of error of Stonemans to be without merit.
 {¶ 31} The Stonemans' second assignment of error reads:
 {¶ 32} "The trial court erred by not entering judgment for the Stonemans on their breach of contract counterclaim against Wheatley."
 {¶ 33} If we were to sustain this assignment of error, we would have to find that the trial court erred in not awarding a judgment in favor of the Stonemans in its decision. The Stonemans would have us find error in the failure of the trial court to enter judgment in their favor in the amount of $13,972.50, representing the difference in the amount they paid out for the second arena, and the contract price of the arena. However, in order to do so, we would have to invalidate the approach taken by the trial court, which we approved in the analysis of the first assignment of error. This we are not inclined to do. In computing a net recovery in favor of Wheatley and awarding a judgment therefor, the trial court was doing no more than what the two contracting parties could have done themselves, which is to setoff one contractual liability against another:
 {¶ 34} "`Setoff, both at law and equity, is that right which exists between two parties, each of whom under an independent contract owes a definite amount to the other, to set off their respective debts by way of mutual deduction.'"[8]
 {¶ 35} By setting off one recovery amount against another, between the same parties, the court was merely enforcing a right that the parties themselves could have claimed:
 {¶ 36} "Courts can allow setoff on equitable principles where necessary to prevent a clear injustice."[9]
 {¶ 37} Therefore, we do not find the method adopted by the trial court to have been against the manifest weight of the evidence and, and accordingly, find the Stonemans' second assignment of error to be without merit.
 {¶ 38} In his cross-appeal, Wheatley raises a single assignment of error:
 {¶ 39} "The trial court erred to the prejudice of Appellee/Cross-Appellant Wheatley in granting a judgment in favor of [appellee] Auto Owners in a monetary amount approximately fifteen times the amount Auto Owners was entitled to recover from Wheatley in light of the undisputed facts and applicable law."
 {¶ 40} Two issues are raised by Wheatley in support of his assignment of error. The first issue is whether Auto-Owners, as subrogee under its insurance contract with the Stonemans, was entitled to recover more than the Stonemans could have recovered for the loss of the first horse arena. The second issue is whether the judgment of $78,750 awarded to Auto-Owners by the trial court is a greater award of compensatory damages as measured by the actual loss sustained by the subrogor.
 {¶ 41} In this assignment of error, we are asked to examine the trial court's judgment from the standpoint of Auto-Owners standing in the shoes of the Stonemans for purposes of its subrogation claim against Wheatley. This differs from our previous discussion, where the two contracts between Wheatley and the Stonemans were intertwined for purposes of determining damages flowing to one or both of them, in that Auto-Owners seeks to recover the amount of money it paid out in respect of the loss of the first horse arena. It is not at all involved in the discussion involving the second horse arena and the contractual rights of Wheatley and the Stonemans regarding the second arena.
 {¶ 42} The Stonemans were the subrogors under a policy of insurance with Auto-Owners. That policy contained a provision authorizing a right of subrogation in favor of Auto-Owners in the event it became necessary to cover the loss of a structure and pay a claim. The complaint of Auto-Owners sought recovery against Wheatley under two different theories of liability: damages against Wheatley as a result of his negligence in causing the collapse of the horse arena, and a breach of contract claim against Wheatley for failure to perform according to his agreement.
 {¶ 43} The Supreme Court of Ohio has held that "[a]n insurer-subrogee cannot succeed to or acquire any right or remedy not possessed by its insured-subrogor."[10] Therefore, Auto-Owners can recover no greater judgment against Wheatley than the Stonemans could have recovered had they proceeded against Wheatley for damages resulting from the collapsed horse arena.
 {¶ 44} The touchstone for compensatory damages awarded to a party for his injury is the actual loss sustained by the injured party:
 {¶ 45} "The fundamental rule of the law of damages is that the injured party shall have compensation for all the injuries sustained. * * * Compensatory damages are intended to make whole the plaintiff for wrong done to him or her by the defendant. * * * Compensatory damages are defined as those which measure the actual loss, and are allowed as amends therefor."[11]
 {¶ 46} Wheatley assumes that the trial court awarded judgment in favor of Auto-Owners on the basis of its claim for negligence against Wheatley, however, the trial court's decision does not say that: "[Auto-Owners] is entitled to Judgment in the amount indicated [$78,750] on both its first and second claims, albeit only one recovery may be obtained against [Wheatley]." Certainly there was a finding of negligence: "[i]t was due to [Wheatley's] negligent construction that the building collapsed." In addition, however, Auto-Owners was awarded a judgment of $78,750 pursuant to its "subrogation interests." While it is not clear from the magistrate's decision that he awarded judgment based solely upon a negligence theory of liability, as opposed to damages for breach of contract, we are inclined to agree with Wheatley that the magistrate steered clear of the contract theory of liability, inasmuch as the first contract morphed into a second contract soon after the collapse of the horse arena.
 {¶ 47} Wheatley goes on at some length in his argument to demonstrate that the magistrate incorrectly awarded a greater amount, by a multiple of fifteen, of damages to Auto-Owners than the Stonemans themselves could have recovered for their loss. He deftly avoids the negligence theory of liability in Auto-Owners first cause of action, and devotes his argument entirely to ascertaining the exact amount lost out-of-pocket by the Stonemans, which he claims to be $5,220.88. He does this pursuant to a contract damages analysis.
 {¶ 48} Therefore, whether the trial court made its award pursuant to a negligence theory of liability or on the basis of breach of contract, the award itself will only be reversed if it is against the manifest weight of the evidence.[12] As stated above, if there is some competent and credible evidence to sustain the judgment awarded to Auto-Owners, then this court will not second guess the reasoning and the decision of the trial court.
 {¶ 49} In that respect, we believe it was entirely proper for the trial court to make an award to Auto-Owners for the damages caused by Wheatley as a result of his negligence. The loss to the Stonemans of the horse arena on the date of its collapse was $76,862, the replacement value of the structure. Issuing checks to the Stonemans and Wheatley in the total amount of $78,750 was consonant with the insurance coverage Auto-Owners had provided to the Stonemans, and fulfilled its duty to its insured at that point.
 {¶ 50} Likewise, when Auto-Owners chose to pursue a subrogation action against Wheatley, it pursued both a negligence theory of liability and a contract theory of liability against Wheatley. The magistrate heard the evidence on both of these theories of liability, and made a finding that the trial court give judgment to Auto-Owners in the amount of $78,750. The computation of this amount has already been explained above. The trial court adopted the recommendation of the magistrate, and rendered judgment accordingly. The evidence was that the replacement cost of the structure was $76,862, and this evidence was competent, credible, and unrebutted. As a reviewing court, we are not inclined to superimpose a contract theory of liability upon the decision of the trial court. Therefore, we find Wheatley's assignment of error to be without merit.
 {¶ 51} The net effect of our decision is as follows: Auto-Owners' judgment is upheld, pursuant to their subrogation action; the Stonemans are in possession of a newly constructed horse arena with an approximate value of $83,500, for which their net cost (after paying Wheatley his judgment) is $57,112; and Wheatley will realize net proceeds of $13,780.62 (after recovering judgment of $27,530.62 from the Stonemans and paying out $78,750 to Auto-Owners). The fact that the Stonemans do not have to pay full price for the horse arena and the fact that Wheatley will receive only $3,780.62 over his labor to compensate him for his out-of-pocket materials costs are the net effects of Wheatley having negligently constructed a horse arena, which collapsed, and having walked off the job before completion. The net effect in dollars serves, therefore, to reinforce the correctness of the trial court's decision.
 {¶ 52} Therefore, the judgment granted to Wheatley in the amount of $27,468.62 is modified to $27,530.62, for the reasons stated above; otherwise, the judgment in his favor is affirmed.
 {¶ 53} The judgment granted to Auto-Owners is affirmed.
Rice, J., O'Toole, J., concur.
[1] C.E. Morris Co. v. Foley Construction Co. (1978), 54 Ohio St.2d 279, syllabus.
[2] W. Wagner G. Wagner Co., L.P.A. v. Block (1995),107 Ohio App. 3d 603, 608-609.
[3] Blue Ribbon Remodeling Co. v. Meistrich (1999), 97 Ohio Misc.2d 8,14, citing Paugh Farmer, Inc. v. Menorah Home for Jewish Aged (1984),15 Ohio St.3d 44.
[4] (Internal citations omitted.) Id. at 15, citing Murray v. MarbroBuilders, Inc. (1977), 53 Ohio App. 2d 1; Thermal Master, Inc. v.Greenhill (Sept. 29, 1987), 10th Dist. No. 86AP-745, 1987 Ohio App. LEXIS 8917; W. Coast Indus. Relations Assn. Inc. v. Superior Beverage Group
(1998), 127 Ohio App. 3d 233; Systemation, Inc. v. Broadview S. L.Co. (Dec. 1, 1983), 8th Dist. No. 46314, 1983 Ohio App. LEXIS 15280;Spitzer v. Forrester (Oct. 19, 1981), 2d Dist. No. 7087, 1981 Ohio App. LEXIS 13159; and Celinski v. Benke (Nov. 29, 1996), 11th Dist. No. 96-A-0020, 1996 Ohio App. LEXIS 5414.
[5] Pennant Molding, Inc. v. C J Trucking Co. (1983),11 Ohio App.3d 248, 251, citing Maloney v. General Tires Sales
(1973), 34 Ohio App.2d 177.
[6] R.C. 2501.02.
[7] Shear v. West American Ins. Co. (1984), 11 Ohio St. 3d 162, 164, quoting C.E. Morris Co. v. Foley Construction Co., supra.
[8] Frost v. Mihm (Nov. 15, 1995), 2d Dist. No. 95-CA-38, 1995 Ohio App. LEXIS 5311, *4-5, quoting Walter v. National City Bank (1975),42 Ohio St.2d 524, 525.
[9] Id. at *9.
[10] Chemtrol Adhesives, Inc. v. American Mfrs. Mut. Ins. Co. (1989),42 Ohio St. 3d 40, paragraph one of the syllabus.
[11] (Citations omitted.) Fantozzi v. Sandusky Cement Prod. (1992),64 Ohio St. 3d 601, 612.
[12] C.E. Morris Co. v. Foley Construction Co., supra.